UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA

VS.                         CRIMINAL NO. 3:16-cr-00071-WHB-LRA-1

ALLEN SIMS




SENTENCING HEARING


BEFORE THE HONORABLE WILLIAM H. BARBOUR, JR.
UNITED STATES DISTRICT JUDGE
SEPTEMBER 11, 2018
JACKSON, MISSISSIPPI




APPEARANCES:

FOR THE GOVERNMENT:    MR. CHRISTOPHER L. WANSLEY

FOR THE DEFENDANT:    MR. PAGE A. PATE
                      MR. E. CARLOS TANNER III


REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012
_____

501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186

1                          TABLE OF CONTENTS

2

3         Exhibit D-1 through D-12  .........................7

4   WITNESS FOR THE GOVERNMENT:

5   DARYL HUHN                                        14

6      Direct Examination By Mr. Wansley  .................14

7      Cross-Examination By Mr. Pate  .....................20

8      Redirect Examination By Mr. Wansley  ...............24

9   Imposition of Sentence...............................51

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          THE COURT:  Mr. Wansley, you have a matter for the

 2   court this morning?

 3          MR. WANSLEY:  Yes, Your Honor.  Before the court we

 4   have the matter United States vs. Allen Sims, criminal number

 5   3:16CR71.  And we're here, Your Honor, for a sentencing as to

 6   Count 1 of the indictment, and Mr. Sims is in court with

 7   honorable counsel, Your Honor.

 8          THE COURT:  All right.  Mr. Sims, will you stand at

 9   the lectern, please, with your attorneys, and would the

10   marshals take the shackles off of the defendant's hands.

11   You're Allen Sims?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  You're standing before the court with your

14   attorneys, Mr. Page Pate and Mr. Carlos Tanner, are you not?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  You understand that you're here today for

17   the purpose of being sentenced in regard to the entry of your

18   guilty plea as to Count 1 of the indictment that was returned

19   against you which was made earlier before this court?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  The court told you that I would have a

22   presentence investigation report prepared by the probation

23   office.  That report has been prepared, and I understand that a

24   copy has been made available to you and your attorneys.  Have

25   you seen the report, have you read it, and have you gone over

1    it carefully with your attorneys?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Have they answered all of the questions

4    that you had about the report for you?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  Are you satisfied with what they have told

7    you about the report?

8              THE DEFENDANT:  Yeah, with what they told me but not

9    the report.

10             THE COURT:  Yeah.  I'm not asking you whether you are

11   satisfied with the report.  I'm asking -- I'm just asking you

12   whether you are satisfied with your attorneys' explanation to

13   you about the report.

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  I understand you have some objections to

16   the report which your attorneys will address to me here in just

17   a minute.

18             All right.  The government did not file any objections

19   to the report.  The defendant has filed a number of objections

20   and the -- the court sees that on page 13 of the objections to

21   the report that the probation office changed the report by

22   removing a marijuana transaction that had originally been in

23   paragraphs 36 and -- through 38 of the original presentence

24   report.  And some more information about that particular

25   transaction were removed from page 57 to 58.

1          Mr. Pate, I understand that you have objections to the

2    presentence report.  I assume that you have no objection to the

3    removal of the transaction mentioned in paragraph 36 through 38

4    and 57 and 58 about that particular transaction.

5          MR. PATE:  That's correct, Your Honor.

6          THE COURT:  All right.  And, Mr. Wansley, the court

7    understands that the government did not file any objections to

8    the presentence report.

9          MR. WANSLEY:  That is correct, Your Honor.

10         THE COURT:  All right.  I think for the record I'll

11   simply state -- and either side may respond to this.  But the

12   court met with the attorneys this morning beginning about 9:30,

13   which was the time this sentencing was scheduled and spent a

14   considerable amount of time discussing whether the -- how to

15   handle the objections to the report under the circumstances.

16   The government's attorney excused himself to confer with his

17   office about some matters, and the result is that we are now

18   ready to go through the usual procedure for a sentencing.

19         Is there anything that either side wants to insert

20   into the record at this time insofar as the conference that the

21   court had with the attorneys outside of the presence of the

22   defendant this morning?

23         MR. WANSLEY:  Not from the government, Your Honor.

24         MR. PATE:  No, Your Honor.  Thank you.

25         THE COURT:  All right.  Let's see.  Mr. Pate, are you

1  going to address the objections to the presentence report for

2  the defendant?

3          MR. PATE:  If I may, Your Honor, yes.

4          THE COURT:  All right.  Mr. Sims, you may have a seat.

5  And, Mr. Tanner, you may stand or have a seat, whichever, if

6  you're going to -- if you're not going to say anything, you may

7  certainly have a seat.  It will be more comfortable.

8          MR. TANNER:  Yes, sir, I'll have a seat for now.

9          THE COURT:  All right.  For the record, the court has,

10  of course, read the presentencing report, has read the

11  sentencing recommendation prepared by the probation office, has

12  read the objections submitted by the defendant to the probation

13  office, has read the sentencing recommendation prepared by the

14  probation office and has read the document entitled Defendant

15  Sims Sentencing Memorandum prepared by his attorneys including

16  the exhibits attached thereto.  Those exhibits are letters from

17  various family members, and I believe they may -- there may

18  have been one or maybe two letters in essence of support for

19  the defendant by a nonfamily member.  Normally those are made a

20  part of the record.  This sentencing -- this memorandum

21  entitled Defendant Allen Sims Sentencing Memorandum has been

22  filed by the defendant, I presume.

23          MR. PATE:  We did not file it at this time, Your

24  Honor.  We simply provided it to the court's courtroom deputy.

25  We were awaiting instructions from the court whether we should

1    file it or file it under seal, whatever the court's pleasure

2    is.

3              THE COURT:  It's normal for recommendation letters to

4    be filed.  Are they filed under seal, Nijah?

5              THE CLERK:  Under seal.

6              THE COURT:  Why don't I hand these to the clerk.  The

7    court has read them.  They are -- have been included with the

8    sentencing memorandum under exhibit numbers 1 through 12.  Why

9    don't we simply mark these as Defendant's exhibit numbers 1

10   through 12, and the clerk will file them separate from the

11   sentencing memorandum.  And since it is not in the record at

12   this time, I will give the court a copy of this sentencing

13   memorandum and direct that it be filed in the record also.  I

14   notice that I have one place on the front page where I have --

15   well, there are a number of places where I have underlined

16   matters when I reviewed that document.

17             MR. PATE:  If it please the court, I have a clean copy

18   of the memorandum, whatever the court's preference is.

19             THE CLERK:  Judge, I can reprint a clean copy.

20             THE COURT:  Let's file a clean copy of that.

21       (Exhibit D-1 through D-12 marked)

22             THE COURT:  Mr. Pate, for your information, I have

23   and have read your letter to Amie Battle, United States

24   Probation Officer, in which you state objections to the

25   presentence report.  If you'd like to make a copy of that a

1    part of the record, you're welcome to do it.  But I have -- I

2    have a copy of that, and I have read it in preparation of

3    this -- for this sentencing hearing.

4              MR. PATE:  Thank you, Your Honor.

5              THE COURT:  All right.  I will hear you at this time,

6    Mr. Pate.

7              MR. PATE:  Thank you, Your Honor.  As the court did

8    note, we filed a number of objections, both to factual

9    assertions in the presentence investigation report and certain

10   sentencing guideline calculations.  As the court knows, this

11   comes before the court in somewhat of an unusual posture given

12   that Mr. Sims has entered a conditional plea reserving his

13   right to appeal the court's order denying our motions to

14   suppress certain wiretaps and searches of residences related to

15   Mr. Sims.

16             So I want the court to, if it will, accept for the

17   record that we are generally objecting to any factual assertion

18   in the presentence investigation report to the extent that it

19   ties Mr. Sims to the charged conduct in the event we're

20   successful on our appeal to the Fifth Circuit and are back

21   before the court for purposes of a trial.  But I don't think

22   it's beneficial today or a good use of the court's time to go

23   through all of those objections line item by line item.

24             We have detailed them and now thanks to the court have

25   made those objections part of the record.  So if it pleases the

1   court, I'd like to focus on what I believe are our three most

2   critical objections that I would make whether there was a

3   conditional plea in place here or not.  These are objections

4   that I think the court should sustain and should adjust the

5   presentence investigation report accordingly.

6         The first objection that I'd like to address today

7   would be to paragraph 71 of the presentence investigation

8   report.  And that paragraph suggests that the court should

9   enhance Mr. Sims's advisory guideline sentence four levels for

10   being an organizer or leader of a criminal activity that

11   involved five or more participants.  And, of course, that

12   recommended adjustment is taken from Section 3B1.1(a) of the

13   advisory sentencing guidelines.

14         In determining whether that adjustment is appropriate,

15   the court is instructed not just by the commentary to the

16   guidelines in the application notes but also the case law to

17   apply a few factors.  The court should consider whether the

18   defendant in the case had a sufficient level of decision-making

19   authority.  What was the defendant's nature of participation in

20   the offense?  Did the defendant recruit accomplices?  Did the

21   defendant claim a larger share of the profits?  What was the

22   defendant's degree of participation in planning or organizing

23   the offense?  And ultimately what was the degree of control and

24   authority the defendant exercised over others?  And I'm taking

25   that from Comment Note 4 to Section 3B1.1(a).

1          In our objections, we also cited for the court *United*

2    *States v. Lewis*, a Fifth Circuit case from 2007 that tried to

3    boil all those factors down to basically control or authority.

4    If you're going to enhance a defendant's sentence by four

5    levels, the court has to find by a preponderance of the

6    evidence that the defendant exercised sufficient control or

7    authority over others.

8          Now, Your Honor, we don't take issue with the fact

9    that this case involved a number of people, but what we do take

10   issue with is that Mr. Sims controlled or exercised authority

11   over those people.  And without going beyond the facts set

12   forth in the presentence investigation report, I think there's

13   enough in here to support our objection.  There are a number of

14   different codefendants and coconspirators that are referenced

15   in the offense conduct section, and I'm going to kind of take

16   them one at time.  And if the court has any questions, please

17   feel free to interrupt me.

18         Beginning on paragraph 31 and continuing through

19   paragraph 39, there's a discussion of how these various

20   transactions took place based on the government's

21   investigation.  In paragraph 31, there's reference to an

22   intercepted communication which was a result of one of these

23   wiretaps between Mr. Sims and a codefendant, Mr. Pacheco.  Now,

24   Mr. Pacheco in this paragraph and I believe is consistent with

25   what the agents found that it was Pacheco who informed Sims

1    that there was a possibility of a potential cocaine deal and

2    basically offered that deal to Sims.  But Pacheco, it appeared,

3    was working on behalf of Mexican suppliers trying to introduce

4    drugs into this district.  Significantly, it was not Sims

5    reaching out to Pacheco.  It was Pacheco offering a deal to

6    Sims.  And it was a deal between Chava, this, I guess, still

7    fugitive individual, who was a major drug surpriser apparently

8    that Pacheco had tried to help broker for him in this district.

9    The significant part there is Pacheco is not working for Sims.

10          There's reference in paragraph 34 to codefendant

11    Vincent Taylor Magee.  Now, it is true that the presentence

12    investigation report references a transaction where Sims

13    allegedly asked Mr. Magee to bring a shipment of drugs from the

14    Atlanta area to Jackson.  And so I guess that the probation

15    office then assumed that means that Magee works for Sims.  But,

16    in fact, in paragraph 34, there is a portion of the transcript

17    of that conversation where Magee makes reference to his own

18    deals, his own transactions, and how he packages and stores the

19    drugs in the deals that he participates in completely separate

20    and apart from Mr. Sims.

21          So while it is certainly possible that on one given

22    occasion for one particular transaction Magee may be helping

23    Sims, that doesn't mean Magee works for Sims.  Magee has his

24    own separate transactions.  He is his own exhibit dealer.  In

25    this case, though, there appears to be a benefit on this one

1    transaction for Magee to assist Sims.  But that is very

2    different than the kind of control or authority that the Fifth

3    Circuit looks for in determining a role adjustment.

4         Then we only need to consider the couriers in this

5    case, the individuals who actually brought the 30 pounds of

6    methamphetamine into this district.  Not only did they not work

7    for Mr. Sims, Mr. Sims had absolutely no contact with them

8    whatsoever.  They either worked for Chava or someone in his

9    organization, but they did not fall up under Sims.

10         There's another codefendant, Arellano "Chilly Willie,"

11    as he's been referred to, someone who's in custody who's acting

12    as a translator, interpreter, broker really, for transactions

13    between Chava and whomever else Chava may be dealing with.  And

14    there's reference in paragraphs 35 and 38 to show that Chilly

15    Willie's involvement is primarily at the direction of Chava,

16    not at Sims.  And I'm referring specifically to 38, where

17    Arellano or Chilly Willie is trying to follow up on payment

18    that Sims allegedly owes Chava.  That doesn't suggest that

19    Chilly Willie a working for Sims.  It suggests that Chilly

20    Willy is working for Chava.

21         There are other references to Julio, paragraph 39.

22    Julio was based out of Mexico and acted as a transportation

23    coordinator and translator for Chava.  So Julio's working for

24    Chava.  Chilly Willie is working for Chava.  Pacheco is working

25    for Chava.  The couriers are working for Chava.  Magee is his

1    own independent guy who may have helped out on one occasion.

2         There's reference to another codefendant, Mullen, in

3    paragraph 39.  Mullen, according to the PSR, sold marijuana in

4    the BOP and was the supplier for Chilly Willie.  And Arellano,

5    Chilly Willie, instructs Sims, not the other way around.

6    Chilly Willie is telling Sims to send money to Mullen.  So I

7    think, Your Honor, while it's easy to accept at first blush the

8    narrative presented by the government in these cases, there's

9    some pyramid here, and Sims is at the top.

10        Even the facts in the PSR don't support that when you

11   really drill down into it.  None of these people, with the

12   possible exception of Lewis who was asked to go to this

13   location to maybe pick up the drugs that were brought in on the

14   relevant date, had any sort of responsibility or accountability

15   to Allen Sims.  He wasn't controlling any of their activities

16   in connection with this or any other transaction referenced in

17   the presentence investigation report.

18        So we think for those reasons, for the facts that are

19   in the PSR, a four-level role adjustment is inappropriate in

20   this case.

21        I have two other arguments.  I don't know if the court

22   wants to take these one at a time and let the government

23   respond.  I'm happy to do it however you want us to do it.

24        THE COURT:  I think -- it would help me if the

25   government would respond to each one and let me try to keep

```
 1   them.
 2          MR. WANSLEY:  Your Honor, in response and for some
 3   clarification, I would like to call DEA Special Agent Huhn to
 4   the stand and ask him certain questions regarding what he may
 5   be able to offer in terms of facts as to Mr. Sims' role as a
 6   leader or organizer.
 7          THE COURT:  Mr. Huhn, you may come around.
 8          MR. PATE:  Your Honor, for the record, Your Honor, we
 9   would request any Jencks material that we have not already been
10   provided.
11          THE COURT:  All right.  Is there additional material
12   that you wish to rely on?
13          MR. WANSLEY:  Your Honor, my understanding is that any
14   reports that have been drafted by this particular witness have
15   already been turned over in discovery.
16          THE COURT:  All right.
17          MR. WANSLEY:  Your Honor, may I approach the witness
18   right quick?
19          THE COURT:  You may.
20      (Short Pause)
21                        DARYL HUHN,
22     having first been duly sworn, testified as follows:
23                     DIRECT EXAMINATION
24   BY MR. WANSLEY:
25   Q   Mr. Huhn, please state your name for the record.
```

1  A   My first name is Daryl D-A-R-Y-L, last name is Huhn,

2  H-U-H-N.

3  Q   And, sir, please state your title and where you are

4  employed.

5  A   I am a special agent with the Drug Enforcement

6  Administration, Jackson district office.

7  Q   And how long have you been a Special Agent?

8  A   I've been a special agent since 2014.

9  Q   Sir, had you participated in the investigation of Allen

10 Sims?

11 A   Yes, I did.

12 Q   I want to ask you, you've been in the courtroom, and you

13 heard defense counsel mention, I believe, a November 9, 2015,

14 intercepted communication between Allen Sims and an individual

15 named Pacheco.  Are you familiar with the wire intercepts that

16 occurred in this particular case?

17 A   Yes, sir.

18 Q   And did you, in fact, review those wire intercepts at any

19 time during this investigation?

20 A   I have.

21 Q   In that wire intercept, I believe -- I'm just trying to

22 make sure I'm categorizing what defense counsel stated that it

23 appeared that Mr. Pacheco was offering, I guess, a source of

24 cocaine to Sims.  Are you familiar with that conversation?

25 A   Yes, sir, I am.

1  Q    Based on your investigation, please tell us what you know

2  regarding that set of circumstance.  Did that have anything to

3  do with Chava?

4  A    Not to -- it did not, in our opinion.  It seemed to be a

5  separate source of supply.  He stated basically that he had a

6  friend that wanted to bring a sample.  Normally whenever

7  Mr. Pacheco came into contact with Chava, it was through

8  Mr. Sims and not the other way around.

9  Q    And so what is your understanding of the role that Pacheco

10  had in this conspiracy or alleged conspiracy with Sims?

11  A    Mr. Pacheco was a facilitator and translator for Mr. Sims.

12  Q    When you say "translator," what do you mean?

13  A    Mr. Sims would call Mr. Pacheco and ask him to translate so

14  that he could communicate with the individuals that were

15  speaking in Spanish.

16  Q    And what individuals are you referring to?

17  A    Chava.

18  Q    But you're not disputing the fact that Pacheco very well

19  was trying to introduce him to a separate source of supply?

20  A    I'm not.

21  Q    So that's very well likely as well.

22  A    Yes, sir.

23  Q    Based on your investigation, do you know of -- or can you

24  explain to the court any instances whether Sims would have

25  instructed other individuals, indicted in this matter or

1    unindicted, to do certain things as part of this conspiracy?

2    A    Okay.  On one instance, Mr. Sims instructed an individual

3    named Jerry Lewis.  The intention of this interaction with

4    Mr. Lewis was to have him to go to the, quote, magic spot,

5    which is just off Fortification where the traffic stop was made

6    on the two individuals Dunfrund and Tejada.  And 30 or the

7    approximately 30 kilograms of methamphetamine was seized.  His

8    role was going to be to go and meet with the individuals, make

9    sure there wasn't a tail, and to follow instruction or await

10   instruction from Mr. Sims to go to a different location,

11   basically to clean the load, to make sure your that law

12   enforcement wasn't attached.

13            THE COURT:  Did he work for Sims?

14            THE WITNESS:  When you say "work for," I'm not -- he

15   was -- he was acting under the direction of Mr. Sims, yes, sir.

16            THE COURT:  All right.

17            THE WITNESS:  He would not have been at that location

18   otherwise.  We did a traffic stop on him as well and were able

19   to positively identify Mr. Lewis.  He would not have been at

20   that location otherwise without the communication from Mr. Sims

21   to be there.

22   BY MR. WANSLEY:

23   Q    Through the investigation, did you learn, I guess -- well,

24   let's go back.  When you say that Lewis was going to be at a

25   location to pick up drugs and you said the magic spot, what

1    location was that again?

2    A    It's the -- I believe it's at the Motel 6 or the Hotel 6,

3    something 6.  It's hotel at the end of Fortification Street on

4    the east end of Fortification.

5    Q    And that particular instance where Mr. Lewis went to that

6    location, surrounding that investigation, did y'all also

7    intercept any drugs from any couriers?

8    A    We did.  That was the instance where we seized the

9    approximately 30 kilograms of methamphetamine.

10    Q    And through the investigation, who did you understand that

11    those drugs were intended to eventually?

12    A    Those drugs -- that was the shipment for Mr. Sims.

13    Q    And is it your understanding -- I guess, specifically, I

14    mean, he's the one that, I guess, spoke to people to order

15    those drugs?

16    A    Yes, sir.

17    Q    Through the investigation, did you learn if there were

18    other individuals that Mr. Sims was, I guess, sharing the

19    proceeds with?

20    A    I'm not sure.  Not sharing proceeds with, I don't believe.

21              MR. WANSLEY:  One moment, Your Honor.

22         (Short Pause)

23              MR. WANSLEY:  Your Honor, that's all the questions I

24    have at this time, and I tender this witness for

25    cross-examination.  I would like to make one announcement, and

1  I do apologize to the court.  The defense asked for any *Jencks*

2  statements of this particular witness.  I was not the

3  individual that, I guess, indicted this matter.  I asked the

4  witness whether he believed that he presented before the grand

5  jury.  He said that he did not recall.  I asked the court based

6  on the rule if it would allow me three minutes to just go

7  downstairs to verify whether he, in fact, did or did not so I

8  can provide that information to the defense.

9          THE COURT:  Any comment from the defendant?

10         MR. PATE:  No, Your Honor.  In an abundance of

11 caution, I think that is the best way to proceed.

12         THE COURT:  All right.  All right.  The court will

13 stand in recess for a short time while Mr. Wansley goes and

14 confers about this in the U.S. Attorney's Office.

15         MR. WANSLEY:  Thank you, Your Honor.

16         THE COURT:  All right.

17    (Recess)

18         MR. WANSLEY:  May it please the court?

19         THE COURT:  Yes, sir.

20         MR. WANSLEY:  Your Honor, thank you again for giving

21 me that time.  I was able to confirm that there was no grand

22 jury testimony that needed -- from this particular witness that

23 needed to be turned over to the defense.  So with that, we

24 tender the witness for cross-examination, Your Honor.

25

1           THE COURT:  All right.

2           MR. PATE:  Thank you, Your Honor.

3                       CROSS-EXAMINATION

4    BY MR. PATE:

5    Q   Agent Huhn, good morning, I think, still.

6    A   Good morning.

7    Q   Just a couple of questions.  You were testifying about

8    Mr. Pacheco or Pa-cheeko.  How do you pronounce it?

9    A   Pacheco.

10   Q   Pacheco.  In a conversation that agents intercepted on

11   November 9, 2015.  Do you recall that testimony?

12   A   I do.

13   Q   And you have listened to that particular conversation and I

14   assume also reviewed reports that you prepared of that

15   conversation.

16   A   Yes, sir.

17   Q   It's true in that conversation, as you testified, that

18   Mr. Pacheco and Mr. Sims were discussing a deal entirely

19   separate from Mr. Chava.

20   A   Yes, sir.

21   Q   Okay.  And that this conversation about this potential deal

22   was brought up by Pacheco.

23   A   It was.

24   Q   And it's fair to say that Mr. Pacheco likely as a drug

25   dealer of his position would have other deals going on besides

1   what he's doing with Mr. Sims.

2   A   I believe that's safe to assume, yes, sir.

3   Q   Is it consistent with your investigation that it's not

4   uncommon for drug dealers at the level of Mr. Pacheco to have

5   maybe more than one or two suppliers?

6   A   I would not see that out of the ordinary, yes, sir.

7   Q   And it's also common for dealers of this nature to have

8   certainly more than one or two customers.

9   A   You said it's uncommon?

10  Q   I'd say common.

11  A   No, it's absolutely common.

12  Q   Okay.  And it's fair to say based on your investigation you

13  have no reason to believe that Mr. Sims had any control or

14  influence over the supplier that Mr. Pacheco was referencing in

15  this conversation.

16  A   For this conversation, no, sir.

17  Q   Okay.  You were asked about a particular individual who you

18  did believe was acting under the direction of Mr. Sims, and you

19  identified a Mr. Lewis.  Correct?

20  A   Yes, sir.

21  Q   And you testified about his, at least, anticipated

22  involvement in that transaction that ultimately led to the

23  seizure of the large quantity of methamphetamine.

24  A   I don't know that you could call it anticipated, but, yes.

25  Q   Well, he didn't pick up any drugs, did he?

1    A    He didn't pick up because the traffic stop had already

2    occurred.  He drove past the traffic stop and then went to see

3    what happened.  That's when we stopped him.

4    Q    Maybe I was assuming too much.  What did your investigation

5    reveal was his role in that particular transaction?

6    A    His role was to meet with the two -- or the individual or

7    individuals who had the narcotics to move them to a different

8    location and to make sure that they didn't have any kind of law

9    enforcement presence with them, what we call a cleaning.  He

10   was cleaning the load.

11            THE COURT:  Are we talking now about Sims or a

12   about -- who are we talking about?  Lewis?

13            THE DEFENDANT:  This would be a communication between

14   Mr. Allen Sims and Mr. Jerry Lewis wherein Mr. Sims directed

15   Mr. Lewis to go to a hotel/motel on East Fortification Street

16   here in Jackson and meet with the couriers for the 30 keys --

17   30 kilos of methamphetamine.

18   BY MR. PATE:

19   Q    Now, during this time, agents have the ability to monitor

20   the telephone conversations of Mr. Sims during the time of this

21   transaction and certainly before that time as well.

22   A    Yes, sir.

23   Q    Okay.  And other than this one occasion that you've

24   referenced, how often is Mr. Sims issuing instructions to

25   Mr. Lewis?

1    A    There were different -- there were different times.  We

2    wouldn't get explicit conversations because a lot of times what

3    happens is these individuals are, you know, worried about their

4    phones being listened to.  So they meet up and talk and make

5    arrangements and plans.

6         Whenever Mr. Sims told Mr. Lewis where to go, he said, *Go

7    to the magic spot*.  He didn't say, *Go to the hotel off of East

8    Fortification*.  So it was already a spot where Mr. Lewis knew

9    what the magic spot meant.  So it's obvious that they had met

10   there at an instance prior to this.  So this was not an

11   anomaly.

12   Q    Well, that's an assumption.

13   A    Sure.

14   Q    I mean, you know, he may be familiar with magic spot

15   meaning a location, but to assume that there are other

16   transactions taking place there is an assumption.  Now, given

17   it's based on your investigation --

18   A    Correct.

19   Q    -- but there were no other phone calls where you identified

20   Mr. Sims giving direction to Mr. Lewis.

21   A    Outside of this event, I'm not sure.  I know that there

22   were communications.  We knew who Mr. Lewis was or is.  If

23   there were other communications, it was going to be small,

24   small stuff to do with a house that they had on Sears Street,

25   which Mr. Lewis stayed at and dealt narcotics out of.

1    Q    There were a lot of conversations intercepted in connection

2    with your investigation in this case.  Correct?

3    A    There were.

4    Q    Could you in any way estimate the number of calls that were

5    recorded?

6    A    I don't know.  I'd have to go back and look.

7    Q    From Mr. Sims alone, would it be fair to say in the

8    hundreds?

9    A    I would estimate that it was more than the hundreds.

10    Q    Okay.

11              MR. PATE:  That's all I have, Your Honor.

12              THE COURT:  Anything further?

13              MR. WANSLEY:  Really brief, Your Honor.

14                        REDIRECT EXAMINATION

15    BY MR. WANSLEY:

16    Q    Would you please explain what your understanding of

17    Mr. Pacheco's involvement in this particular conspiracy was.

18    A    All right.  So in the beginning of the investigation with

19    Mr. Sims, it was clear that he had made a contact but that his

20    contact or his source for methamphetamine or for illegal

21    narcotics only spoke Spanish.  So he needed an interpreter, and

22    he got in contact with Mr. Pacheco and told him repeatedly that

23    he needed him to translate.  He would call him and say, *Hey, I*

24    *got to call my guy.  I need you to translate.*

25    Q    And did Mr. Pacheco, in fact, do that?

1    A    He did.

2         MR. WANSLEY:  That's all I have, Your Honor, and would

3    like to reserve this witness for, I guess, later objections if

4    testimony is needed, Your Honor.

5         THE COURT:  All right.  You may step down.  Mr. Pate?

6         MR. PATE:  Thank you, Your Honor.  And on that issue,

7    the one thing I would suggest that the court do and

8    respectfully request that the court do is look at the Lewis

9    case, the 2007 Fifth Circuit case, that talked about the need

10   to show control or authority.

11        Let's assume Pacheco is acting as or translate between

12   Sims and Chava.  What sort of control or authority does Mr.

13   Sims have over that?  The man's in prison, at my understanding,

14   during the time he's on the phone translating.  He is not

15   running around doing errands for Mr. Sims.  He's not being paid

16   as some employee of Mr. Sims.  He facilitates, and that's

17   absolutely true.  But that doesn't put him in any way under

18   Mr. Sims for purposes of this analysis.

19        And the same for Mr. Lewis.  If we talk about an

20   investigation with hundreds of calls, the government is able to

21   identify one call or a couple of calls on one occasion where

22   Sims asked somebody to help out by meeting someone.  You know,

23   if that's the case, if that's the standard, there should be an

24   aggravating role enhancement in every single drug case before

25   the court because you don't do it alone.  Even in simple

1    buyer/seller transactions, there's going to be somebody else

2    who's somehow involved.  But just because there are a number of

3    people doesn't mean we have to put one of them on top unless

4    that person is clearly on top.

5           So you enhance Mr. Sims by four levels, that's what

6    somebody like El Chappo or Pablo Escobar would get.  It doesn't

7    get any higher than four levels.  So I think we really do a

8    disservice to the intent behind the guidelines if we do a

9    four-level enhancement in a case like this and say, well,

10   that's the best we got so that's what we do for all these other

11   true drug kingpins.

12          Your Honor, the other argument --

13          THE COURT:  But we're not talking about drug kingpins.

14   We're talking about people who were at the head of a drug

15   dealership, which does not have to be as large -- large enough

16   to qualify as being a kingpin, does it?

17          MR. PATE:  No, it does not, Your Honor, absolutely

18   not.  I think that's potentially a problem with the guidelines.

19   But in the application notes where they say you don't have to

20   be a drug kingpin, it also notes the availability of these

21   lower levels of enhancements.  It's a two-level enhancement in

22   some cases to try to differentiate between that well-organized

23   cartel type of situation and a bunch of loose drug dealers in a

24   particular area who happen to work together on a variety of

25   occasions.

1          The next issue that I wanted to present some argument

2    on was our objection to paragraph 69, which was the enhancement

3    for pattern of criminal activity.  And my objection to that

4    particular paragraph is primarily based on the same objection

5    that we just argued before the court because in order to

6    enhance a defendant's two levels under this subsection, the

7    court has to find that there's, first, an aggravating role in

8    the case.  And so we would suggest based upon the evidence, the

9    PSR, and the facts of this case that the role isn't appropriate

10   and so the pattern is not appropriate.

11         And if you think about it, Your Honor, we can keep

12   adding numbers in the guidelines until it gets to a point where

13   we are double and triple counting for a defendant's criminal

14   conduct.  This is a large-scale drug case, and that's why we're

15   starting out at an offense level 38.  But we want to add four

16   more points basically because it's a large drug case and this

17   is the guy who's being held responsible for it?  Add another

18   two levels for dealing drugs, which, of course, is at the heart

19   of the case?  I mean, at some point these numbers start to lose

20   their effect and their intent and purpose.  So, again, in the

21   absence of an aggravating role, the pattern enhancement is not

22   appropriate.

23         I don't know if the government wanted to argue the

24   pattern issue before I move to our final argument.

25         MR. WANSLEY:  May it please the court?

1          THE COURT:  Yes, sir.

2          MR. WANSLEY:  Your Honor, as to -- I guess because

3    there are both related, the enhancement under paragraph 71 for

4    the role offense as well as the pattern of criminal conduct

5    enhancement for paragraph 69, I can address both at the same

6    time.

7          There are instances in the PSR as well as from the

8    testimony of Special Agent Huhn where Mr. Sims has instructed

9    other individuals to do things as part of this conspiracy.  I

10   wanted to clarify one fact is that I don't believe that there

11   is any fact in the PSR or even before the court that

12   Mr. Pacheco was actually incarcerated during the time that he

13   was interpreting phone calls for Mr. Sims.  In fact, I believe

14   it is the government's position that Mr. Pacheco was actually

15   at that time a free man, and the only reason that he was

16   interpreting these phone calls was at the direction of and at

17   the request of Mr. Sims.

18         You also have instances in the PSR that state -- and

19   I'll direct the court to paragraph 42 where Sims advised Julio

20   that he, Sims, would send the address to Julio via text message

21   as the location was different.  So at that time, Sims is

22   changing the location of the meet.  He had control to change

23   the location.

24         Sims also advised in paragraph 43 Lewis to be on

25   standby and that he, Sims, needed Lewis to meet the boy at the

1    same spot where he did the magic trick.  So you have Sims

2    instructing Lewis on -- on the need to meet and where to meet.

3    So again, in the totality, Your Honor, we believe that there's

4    sufficient facts before the court to warrant the enhancement as

5    written in paragraph 74.  And because of that, Your Honor, we

6    believe, then, that the enhancement under 79 -- under 69,

7    paragraph 69, also should apply for all of the reasons that are

8    stated in the PSR that we would ask the court to adopt.

9              And that's my argument on those two points, Your

10   Honor.

11             THE COURT:  All right.  Does that complete your

12   argument?

13             MR. WANSLEY:  Yes, Your Honor.

14             THE COURT:  All right, sir.  Mr. Pate?

15             MR. PATE:  Thank you, Your Honor.  May it please the

16   court.

17             THE COURT:  Yes, sir.

18             MR. PATE:  The other issue that I wanted to bring to

19   the court's attention in addition to those two particular

20   objections was the lack of any credit for acceptance of

21   responsibility in the case.  And I believe the best way to

22   reference it in the PSR is paragraph 75 where's there's simply

23   no credit given to Mr. Sims for accepting responsibility.

24             Mr. Sims pled guilty in this case before Your Honor to

25   a drug conspiracy that he knew at the time would potentially

1    subject himself to an advisory sentencing guideline range of

2    life in prison.  The only reason to avoid the cost and expense

3    to the government, the court, the taxpayers of going through a

4    trial like that would be to get the benefit of accepting

5    responsibility.  No one would plead to a case where they're

6    looking at life unless there would be some benefit to them by

7    doing so.  And I don't think it's disputed in this case that

8    Mr. Sims' decision to accept responsibility and enter that plea

9    avoided a trial for other defendants in this case.

10           Now, it is true that this plea is a little different

11    because we have reserved the constitutional argument that we

12    made before the court relating to the search warrants and

13    wiretaps, but the case law in the Fifth Circuit is clear that

14    reserving legal issues like that does not take away acceptance

15    of responsibility.  And I cited in my objections the *Washington*

16    case, Fifth Circuit in 2007.  And significantly, Your Honor, in

17    that case it was after a trial.  The defendant actually went to

18    trial to preserve those issues, was not given acceptance,

19    appealed it to the Fifth Circuit and the Fifth Circuit said he

20    is entitled to that consideration, even though he went to

21    trial.

22           Now, clearly in that case there was no written

23    statement to the probation officer, "I did it and I'm sorry."

24    And it seems -- I don't know the right word to use, but to

25    judge a defendant's exception over whether or not he writes the

1  letter doesn't seem consistent with what the sentencing

2  commission is asking the court to consider if a person has

3  truly accepted responsibility for what they did.  He admitted

4  in open court.  He was guilty of Count 1, which was a

5  significant drug transaction.  He stood before Your Honor,

6  swore an oath, and said yes.

7          Now, we advised him, his lawyers advised him -- and

8  this is no secret to the court, because of the nature of this

9  plea and the possibility of a trial after the appeal, you can't

10  write a letter to the probation officer saying you did it.  So

11  I think it's unfair to the defendant to take away acceptance

12  simply because we're just trying to preserve our argument on

13  appeal which was the whole basis of the plea.

14          And when you get to a situation where you're looking

15  at life if you plea, the only reason to do it was so that the

16  court would consider acceptance and giving him credit for the

17  plea.  Otherwise, he's looking at exactly the same thing as if

18  he went to trial.  And I don't think as a policy matter or for

19  other cases that come before the court for that to be the

20  message we're sending to defendants.  You can plead guilty, but

21  you're not going to get acceptance unless you write a letter to

22  the probation officer.

23          I think in most cases that makes perfect sense.  In

24  this case because we've got that appeal issue we need to

25  reserve, it just doesn't make sense, and I think the Washington

1   case supports our argument on that particular issue.

2          THE COURT:  Your position is he should get a credit of

3   how much for acceptance of responsibility?

4          MR. PATE:  Pursuant to the plea agreement, a full

5   three levels because he did enter that plea and save them the

6   time to prepare for trial.  I know there was a number of

7   additional materials they were going to produce to us if we

8   went to trial.  Mr. Sims' plea avoided the necessity of doing

9   that.

10         THE COURT:  Mr. Wansley, any response from the

11  government?

12         MR. WANSLEY:  Your Honor, that is a recommendation in

13  the PSR that was written in the United States Probation Officer

14  that was assigned this particular case.  I will tell you that

15  based on sentencing guidelines section 3E1.1, I believe that

16  there is an argument based on application note 1(a) that

17  supports the recommendation from United States Probation where

18  it does state that the defendant must truthfully admit the

19  conduct comprising offenses of the conviction, and I believe it

20  is the position of the United States Probation that that was

21  not done.  Because this is a matter that was recommended by

22  probation, I don't know if there is something else that United

23  States Probation would like to offer, Your Honor.

24         THE COURT:  Ms. Battle, anything you would like to

25  help in clarifying this matter?

1          MR. WANSLEY:  Well, and, Your Honor, I need to, I

2    guess, state for the record as part of the plea agreement, it

3    was the recommendation of the government that the defendant

4    receive a sentence in the lower 50 percent of the guideline

5    range and be considered for the reduction for acceptance of

6    responsibility.

7          THE COURT:  All right.  But the guideline range ends

8    up being life imprisonment regardless of how you compute it,

9    almost, under the presentence report.  Is that not correct?

10         MR. WANSLEY:  As the presentence report is written,

11   Your Honor, as it stands now before any rulings of Your Honor,

12   Your Honor is correct, that the guideline calculation would be

13   life, Your Honor.

14         THE COURT:  What is the -- and, Ms. Battle, you may be

15   the best one to answer this.  What is the lowest total offense

16   level that would remove the possibility of life imprisonment?

17         PROBATION OFFICER:  Your Honor, the defendant's

18   offense level would have to be at least a 42 in order for him

19   to be eligible at any criminal history level to be 360 to life.

20   Any offense level at 43 or above is a life guideline

21   recommendation regardless of criminal history.

22         THE COURT:  And so the total offense level as computed

23   in the presentencing report is 43.  Correct?

24         PROBATIN OFFICER:  The actual offense level as

25   currently computed was 50, but the -- with all enhancements and

1    without acceptance of responsibility, the total offense level

2    was 50; however, the guidelines maxed out at 43, and so the

3    official offense level is 43.  However, to get below 43 to 42,

4    we would have to actually come down from 50.

5         THE COURT:  All right.  All right.  Let's see.

6    Mr. Wansley was going to suggest that you might want to have

7    some input to help the court.

8         PROBATION OFFICER:  Yes, Your Honor, concerning

9    acceptance of responsibility --

10        THE COURT:  Let me refer to the presentencing report.

11   What paragraph would that be?  62?

12        PROBATION OFFICER:  Yes, Your Honor 62.

13        THE COURT:  All right.  Why is not the entry of the

14   plea in itself really prima facie evidence of acceptance of

15   responsibility?  I understand that it's been kind of a, yes, I

16   did it but no I really didn't do it because I want to preserve

17   my appeal rights, and I want to -- I want to reserve my rights

18   if I win on appeal to come back and have a full and fair trial

19   on everything without any -- giving up anything now.  I have

20   discussed these with the lawyers in camera and off of the --

21   off the record just for your information and understanding that

22   I am aware of that issue and it has not been resolved.  But, at

23   any rate, you may go ahead with your train of thought.

24        PROBATION OFFICER:  Yes, Your Honor.  Defendants can

25   accept responsibility in multiple ways.  The most typical way

1    is through a verbal statement at the time of the presentence

2    investigation interview.  That was conducted, I believe, on the

3    same date as the change of plea hearing in this case.  And at

4    that time, I asked counsel how did he want to handle the

5    acceptance of responsibility statement because typically the

6    guidelines in 3E1.1 in their application note specifically

7    states that defendants aren't afforded acceptance of

8    responsibility for pleading guilty as a right.  There has to be

9    some sort of acceptance beyond that, some sort of demonstration

10   to the court that, I'm pleading guilty because I am guilty and

11   here is why and that I have accepted responsibility for that.

12        So at the time of the presentence interview, counsel

13   indicated that they did not want to speak verbally about the

14   matter, which is certainly within their right and that they

15   would forward a written statement at a later date.  That letter

16   never came.

17        Those are your typical two ways of demonstrating to

18   probation that you have accepted responsibility, either a

19   verbal statement or a written statement.  That's the same in

20   all cases.  But the matter was further complicated after

21   probation received the objections from the defendant, and the

22   guidelines have been very clear that the defendant is allowed

23   to remain silent on matters of relevant conduct but is not

24   afforded the right to remain silent in order to get acceptance

25   of responsibility for matters involved in the offense of

1    conviction.

2            And in this particular case, the defendant has

3    maintained at least one material objection to the one kilogram

4    of methamphetamine that was brought to him by a codefendant,

5    Vincent Magee.  Now, in the change of plea hearing, he agreed

6    to that conduct, that he stated to the court that he was

7    involved in two separate methamphetamine deals and that the

8    only disagreement was with the second deal, which would have

9    involved the 30 kilograms of methamphetamine.  However, in his

10   objections to the presentencing report, he objected to being

11   held responsible for one kilogram of methamphetamine.

12           And it's probation's opinion at that point he's now

13   objecting to material information that was included in the

14   offense of conviction, and that's not consist with acceptance

15   of responsibility, and the guidelines would indicate that a

16   defendant, despite pleading guilty, if he then still denies

17   material conduct in the offense for which he plead guilty, that

18   he has not accepted responsibility and would not be eligible

19   for either two or three levels of acceptance.

20           Obviously, the matter is subjective, and it is within

21   the court's discretion to grant acceptance based on the guilty

22   plea and the agreement to the factual basis that was read into

23   the record at the change of plea hearing.  Probation does

24   recognize that this is a unique case in that he is attempting

25   to say he's guilty but not really.  But it is probation's

1    opinion that at least at this time he has not fully accepted

2    responsibility for his actions.

3            THE COURT:  All right.  Thank you.  Would you like to

4    address that, Mr. Pate?

5            MR. PATE:  I would, and thank you.  And I appreciate

6    Ms. Battle's work on the case, and I don't fault her for her

7    analysis, but at no time has Mr. Sims said, *I didn't do any of*

8    *this*.  In fact, as Ms. Battle referenced in the report and the

9    addendum and just now to the court, he admitted to the

10   transaction that was relevant and necessary to enter his change

11   of plea.

12           What do you want him to do from that point forward?

13   If he gives this letter saying, *I'm guilty I did it,* which

14   Ms. Battle suggests would somehow be sufficient enough for

15   acceptance, then he's completely gutted the protections of Rule

16   11(2), which is the whole point of the conditional plea.  If

17   you enter the plea and are successful on appeal, then you have

18   the right to withdraw your plea.  That's great for what happens

19   in this courtroom at the Rule 11 proceeding, but some

20   subsequent out-of-court statement to probation, there's nothing

21   in Rule 11 that says that disappears.

22           So you're putting the defendant in a position where

23   he's given permission by the government and the court to

24   preserve his constitutional right, but then he waives it and

25   effectively looses that if he provides some external

1    out-of-court statement to probation.

2            So I think the *Washington* case is clear.  That

3    defendant goes to trial and gets acceptance.  There's not even

4    a guilty plea in that case.  And the court -- the Fifth Circuit

5    recognized this is unusual, but this is how we have to proceed

6    in Rule 11(a)(2) cases where they are preserving a right or

7    going to trial, in Mr. Washington's case, to preserve the right

8    to appeal the constitutional argument.

9            So I recognize it's a difficult situation, it's an

10   unusual situation, but I think the Fifth Circuit law supports

11   us here, and common sense supports us because Rule 11(a)(2)

12   would have no meaning whatsoever if you could take back what

13   you said in open court but not extraneous statements given to

14   probation outside of court.  So I do think the law supports us

15   on that objection.

16           THE COURT:  All right.  The court is not ready to rule

17   on these -- does this raise all issues from the defendant?

18           MR. PATE:  Your Honor, those are the issues -- other

19   than what the court's already made a part of the record, those

20   are the only guideline issues we wanted to argue today.  I had

21   a very brief argument on the 3553 factors, but that completes

22   my argument as to the guidelines.

23           THE COURT:  All right.  Where does the government

24   stand on guideline arguments?

25           MR. WANSLEY:  The government has no other proof or

1    testimony or argument in response to the objections that have

2    been made at this time by the defense, Your Honor.

3            THE COURT:  All right.  It's now 12:30.  We still have

4    a way to go before we -- before the court can rule on the

5    sentencing in this case.  I have another sentencing set at

6    1:30.  Are you involved in that one, Mr. Wansley?

7            MR. WANSLEY:  Yes, Your Honor.  I will be in the court

8    for that as well.

9            THE COURT:  Do you have a suggestion as to whether

10    it's going to take us another while to finish this one up?

11    Should we just delay that one and do it later in the afternoon?

12            MR. WANSLEY:  That would be my suggestion, Your Honor.

13    I don't -- once the court rules on the objections and fashions

14    a sentence, I believe this matter will go fairly smoothly then

15    the court would just have to hear argument on the 3553 factors

16    for whatever departure or variance that the defendant is

17    requesting.  So that is a fairly good suggestion is that I

18    believe if the court wanted to take a recess now, come back,

19    finish this matter, and I think that we could quickly pick up

20    on the second matter, Your Honor.

21            MR. PATE:  If it helps the court, we did not intend to

22    present any evidence on the 3553 matters, just argument.

23            THE COURT:  Just the argument?

24            MR. PATE:  Yes, Your Honor.

25            THE COURT:  All right.  All right.  Ms. Battle, you

1    have -- are you -- would you like to say something?

2            PROBATION OFFICER:  Yes, Your Honor.  My mic doesn't

3    appear to be working.  Just for clarification because we did

4    hear argument on three of the material objections to the

5    guideline calculations but there were others, what is the

6    status of those arguments?  Are they still -- do they still

7    need to be ruled on as well, they just didn't have any oral

8    argument or I just wasn't clear on the remaining objections?

9            THE COURT:  And, Ms. Battle, you're not the judge in

10   this case so --

11           PROBATION OFFICER:  Yes, Your Honor.

12           THE COURT:  -- I'll tend to that.

13           PROBATION OFFICER:  Yes, Your Honor.

14           THE COURT:  Okay.  All right.  Let's then stand in

15   recess until about 1:30, and I'll get the clerk to notify the

16   people involved in the next case, other than you, Mr. Wansley,

17   that we'll take that up at about 3:00.

18           MR. WANSLEY:  Yes, Your Honor.  I will also contact

19   defense counsel in that matter as well.

20           THE COURT:  All right.  All right.  Ms. Battle, would

21   you step back into chambers with me, please.

22           PROBATIN OFFICER:  Yes, sir.

23           THE COURT:  All right.  We'll stand in recess.

24        (Recess)

25           THE COURT:  All right.  I presume we're ready to

1    resume, and I don't know where we were.

2         MR. WANSLEY:  Your Honor, the parties had, I guess,

3    finished argument on the standard objections to the conspiracy,

4    I guess, awaiting ruling on those objections, and the defense

5    is prepared when the court is ready for argument based on the

6    3553 factors.

7         MR. PATE:  That's correct.

8         THE COURT:  All right.  Mr. Pate, I'll hear you now.

9         MR. PATE:  Thank you, Your Honor.  As the court noted

10   earlier, we did submit last week a sentencing memorandum

11   primarily outlining some of the factors under Section 3553,

12   nature and characteristics of the offense conduct here, and the

13   history and circumstances of the individual defendant.

14        In addition to that memorandum, we provided the court,

15   as the court has referenced today, a number of character

16   letters from family members, friends, people who have known

17   Allen Sims well before this particular offense that brings him

18   before the court.

19        To begin with -- and I know the court is well aware of

20   this -- the guidelines are but one part of what a district

21   judge is supposed to consider when imposing sentence, and in

22   the presentence investigation report, there's a reference at

23   the end of the report that there are no factors that warrant a

24   variance under 3553, and I think that's the wrong way to look

25   at Section 3553.

1       This is not a situation where you have to find a

2  reason to depart.  This is not the old guidelines pre-*Booker*

3  standard.  After *Booker*, courts -- the Supreme Court has

4  numerous -- on numerous occasions emphasized the district

5  judges that, yes, you have to calculate the guidelines but that

6  is by no means the end of the job.  You then have to weigh all

7  of those other factors under Section 3553(a), which include the

8  history and characteristics of the defendant, what is unique

9  about him that the court should consider when imposing

10  sentence.

11       You have to consider the nature and circumstances of

12  the offense.  You may think, well, isn't that part of the

13  guidelines?  It is, but it's a separate factor, and I think

14  there's a reason why Congress made it a separate factor,

15  because Congress likely realized that in many cases a simple

16  rote application of the sentencing guidelines would not be the

17  right sentence and so they instruct the court, Calculate those

18  but then look at all these other factors:  Appropriateness of

19  the sentence for deterrence purposes, both specific to the

20  defendant, general to society at large.

21       In this case, Your Honor, I don't think there's any

22  dispute, we have an individual who has a prior history of drug

23  convictions, marijuana drug convictions.  Even in connection

24  with this investigation, there was obviously evidence to

25  suggest that he was dealing marijuana to the local community.

1  What happened in this case based on what I've seen from all the

2  discovery materials, listening to the tapes, he gets involved

3  with this transaction for a lot of methamphetamine, an

4  attempted distribution of methamphetamine.  And it is

5  significant that this methamphetamine was seized by law

6  enforcement and not distributed in the community.

7        But this one attempted drug deal put him at a level 38

8  under the guidelines, and what Ms. Battle said, which I think

9  is very significant and bears repeating, at an offense level

10  43, no matter what your criminal history is, the guidelines

11  recommend life.  So if we assume in this case that Mr. Sims had

12  never had any other drug dealings in his past, had never had

13  any prior convictions, based on the facts in this case, as a

14  first time offender, he would be looking at the guideline range

15  of life, which suggests to the court that placing emphasis on

16  that or relying on that or even that as a starting point is not

17  appropriate under 3553.

18        The character letters, Your Honor, that we submitted

19  to the court are consistent, I think, in a number of ways.

20  They all speak for Mr. Sims' care and concern for his family,

21  and many of those family members are here today.  They've been

22  here all morning.  They've written letters in support of him,

23  and they can attest to the one thing that's remained constant

24  in his life, which is, he's there for his family when they need

25  him.  His father writes that he has shown remorse for his

1    actions.  He has a family that needs him and loves him.

2         His cousin writes, "He is a very loving, caring and

3    family oriented man.  He has always been there for me and

4    anyone else in the entire family."

5         Another family member writes that, "He has played the

6    role of a father figure in the absence of my father and has

7    been there for me when I needed him.  He is a loving and caring

8    family man."

9         And then a letter from his aunt which I think speaks

10   not just to that fact that he's respectful to family members

11   but that he has rediscovered God since his arrest in this case

12   and has accepted Christ.  Now, we hear that a lot in sentencing

13   situations, but I can tell you from my personal interactions

14   with him, that has been the basis of many of his decisions that

15   he's made as far as how to handle his case and how to resolve

16   it.

17        And I don't doubt the sincerity of family members who

18   speak to his character and what he's like now, that he's been

19   in custody for two years since his arrest in this case, time to

20   think about where life has brought him, where it has led him,

21   and what remains of his life if the court sees fit to sentence

22   him in a manner that gives him some additional time to do

23   something else other than rot in prison.

24        He's 41 years old.  And when you look at the language

25   of 3553, the one factor that is overarching is that the

1    sentence needs to not be greater than necessary to accomplish

2    the sentencing factors in that subsection.

3              Life is the maximum.  How much is enough in a case

4    like this, when it's primarily based on this one attempted drug

5    transaction.  I have not suggested to the court, neither has

6    Mr. Tanner in our submissions, what that number is or what that

7    number should be.  And I do that out of respect to the court,

8    the court's experience with these matters, the court's

9    understanding of the facts of this case and consideration of

10   all the relevant factors.

11             I do contend that life is far, far greater than

12   necessary to satisfy the purposes of Section 3553.  The floor,

13   the bottom, is ten years because of the mandatory minimum.  The

14   ceiling is life.  It is entirely within the court's discretion.

15   In fact, it is a requirement of that discretion that the

16   sentence not be based solely on the guidelines.  It's all of

17   the other factors considered together.

18             So, Your Honor, we encourage the court to impose a

19   reasonable sentence given all the facts in the case.

20             THE COURT:  All right.  Does the government have any

21   further comment or argument about -- before -- before the court

22   moves to sentencing the defendant?

23             MR. WANSLEY:  Only that we want to state for the

24   record that -- and again reiterate what the government's

25   recommendation is.  The government's recommendation is a

1    guideline sentence of lower 50 percent of the guideline range.

2    Understanding that, we entered into that agreement before the

3    guideline calculation came out, but that is the agreement that

4    we entered into with the defendant, and the government stands

5    behind its agreement with that defendant, Your Honor.

6           THE COURT:  Thank you.  Mr. Sims, would you stand at

7    the lectern, please.  Mr. Sims, before I sentence you, you have

8    the right of allocution.  That means that you have a right to

9    address me on anything that you think you might want to say in

10   regard to the sentence I am considering giving you.  You may

11   speak for yourself; you may have your attorney speak for you.

12   If both of you wish to speak, both of you may speak and -- both

13   attorneys may speak, if they wish.

14          THE DEFENDANT:  No, sir.

15          MR. PATE:  Your Honor, I've discussed it with

16   Mr. Sims, and he wants to simply rely on the statements of

17   counsel.  He is somewhat concerned, again, about making

18   statements that could later be used against him.

19          THE COURT:  All right.  Is that correct, Mr. Sims, you

20   do not wish to make a statement?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  All right.  Any further remarks from

23   defense counsel?

24          MR. PATE:  No, thank you, Your Honor.

25          THE COURT:  The court has considered the objections to

1    the computation of the offense levels as are set forth in the

2    presentence report.  Those have been argued here extensively in

3    this hearing.

4            The court has -- the defendant has argued that the

5    offense level has been improperly computed basically for three

6    reasons.  One, that the -- and under paragraph 69 of the

7    presentence report that the report was improper in that the

8    defendant was not a manager or supervisor within the

9    organization and that the defendant did not commit the offense

10   as a part of pattern of criminal conduct engaged as a

11   livelihood.

12           There were several people involved with the defendant

13   in this organization, at least five.  He was clearly the

14   manager.  He was clearly the supervisor.  He clearly was

15   calling the shots.  The court also finds that the defendant was

16   engaged in this drug trafficking as his livelihood.  He has

17   claims that he was working for his mother in her restaurant,

18   but the amount of cash money that was found in his house was

19   far and above what he could have made from that restaurant in a

20   much longer time than he worked there.  The court is convinced

21   that the 300 and some odd thousand dollars worth of cash were

22   drug proceeds and finds that he was engaged in the drug trade

23   as his livelihood.

24           The defendant also objected to the two-level

25   enhancement because the methamphetamine was not shown to have

1    come from Mexico.  It is clear to the court that this

2    connection was a Mexican drug connection, even though the drugs

3    were first delivered to Atlanta where the defendant arranged to

4    have them picked up by one of his agents and brought to

5    Jackson, Mississippi.  The phone calls that were intercepted by

6    the DEA clearly showed that the drugs -- there was a drug

7    connection to Mexico and that they came from there.

8        The defendant also objected that the weapons were not

9    connected that were found in his house.  Two guns were found in

10   his house, which is where the money was, and he clearly had

11   dangerous weapons and possessed them where he did his -- at

12   least some of his drug business.

13       The court accordingly finds that the adjusted offense

14   level as set forth in the presentence investigation report of

15   50 was properly computed.  However, the report does not give

16   the defendant a three-level reduction for acceptance of

17   responsibility.  I think by his pleading guilty, even though

18   it's been really a conditional plea, that the court disagrees

19   and that the defendant has demonstrated an acceptance of

20   responsibility in the instant offense and accordingly awards a

21   three-level decrease from the adjusted offense level computed

22   at 50.  That reduces the adjusted offense level to 43.

23       The defendant -- the court is concerned that the

24   defendant served a substantial sentence for dealing in drugs

25   and had -- I believe I'm correct that he had not been out of

prison on that conviction for longer than two years at the time

of this conviction.  Clearly, the defendant did not learn

anything by that incarceration.  Families can always come up

with finding recommendation for their loved ones, and I do not

blame family members for those kinds of recommendations.  But

in this instance, they have to be judged in what they are.

Here's a man who loves them so much that he gets out of prison

after six or eight years and immediately comes back and gets

into the drug business.  He did not learn his lesson.  He has

continued to continue with the same type of activity.

The guideline range as computed calls for a prison

term of ten years to life followed by a five-year term of

supervised release with a fine of 50,000 to $10 million and a

special assessment of $100.

Mr. Sims, the court has considered Section 18 United

States Code Section 3553 which directs the court to impose a

sentence sufficient but not greater than necessary to comply

with the purposes set forth in paragraph 2 of this subsection

and in determining the particular sentence to be imposed to

consider certain factors:  The nature of the offense and the

history and characteristics of the defendant.  As I have

indicated, the nature of the offense is bad.  The indictment is

for a considerable amount of methamphetamine, and the defendant

has a long history including long incarceration for drug

dealing.  Not the same as methamphetamine, but he took a step

1    up when he came back and got out of prison.  Gave up on regular

2    marijuana and went to meth.

3         Subparagraph 2, the need for the sentence to impose --

4    for the sentence imposed to reflect the seriousness of the

5    offense, to promote respect for the law, and to provide just

6    punishment for the offender.  Certainly that should all be

7    covered in the sentence that I impose.

8         To avoid adequate deterrence for criminal conduct.

9    Frankly, with this man, I don't know that any sentence I could

10   impose would defer criminal conduct other than to impose a

11   sentence of life where he could not be completely deterred from

12   further criminal conduct.

13        Subsection C, to protect the public.  There's the same

14   issue there as to adequate deterrence.

15        In subsection D, to provide the defendant with needed

16   educational, vocational training, medical care, and other

17   correctional treatment in the most effective manner.  The court

18   does not consider that to be a factor in the case.

19        Subsection 3, the kinds of sentences available.  In

20   this case, the kinds of sentence available is life

21   imprisonment, and the question is whether to impose that.

22        And then finally, number 4, the kinds of sentences and

23   sentencing range established for the applicable category of

24   this offense.

25        The court has concluded that a life sentence will

1    serve no useful purpose to this man, to the community, or to

2    the country.  It is well -- it's well too harsh for the crime

3    involved, and because there was no evidence that anybody was

4    actually harmed by this.  However, a sentence needs to be

5    lengthy enough to show that the court is concerned about the

6    crime, about the involvement of this man in that, about his

7    criminal record and the fact that he almost immediately got

8    back into drugs when he got out of prison after an extended

9    prison stay.  So the court has taken the 3553 factors into

10   consideration and considers that a life sentence is not

11   appropriate.

12        Allen Sims, the court hereby imposes a sentence upon

13   you of 180 months, which is 15 years, to be followed by a term

14   of supervised release of five years.  The court also imposes a

15   fine of $5,000 which is a downward departure and payable

16   immediately and during the term of incarceration.  The court

17   has determined that you do not have the ability to pay interest

18   on the fine, and interest -- and the interest requirement is

19   waived.

20        When you are released from imprisonment, any balance

21   remaining shall be paid in monthly installments of not less

22   than $100 per month beginning 60 days after release from

23   imprisonment.  In the event the fine is not paid in full prior

24   to the termination of supervised release, you are ordered to

25   enter into a written agreement with the financial litigation

1  unit of the United States Attorney's office for payment of the

2  remaining balance.  Additionally, the value of future

3  discovered assets may be applied to offset the balance of

4  criminal monetary penalties.  You may be included in the

5  treasury offset program allowing qualified federal benefits to

6  be applied to offset the balance of the monetary penalties.

7         Upon your release from prison, you shall be placed on

8  a five-year term of supervised release.  Within 72 hours of

9  release from custody, you shall report to the probation office

10 in the district to which you are released.  While on supervised

11 release, you shall comply with the standard and mandatory

12 conditions as listed on the judgment order and you shall not

13 possess a firearm.

14         In addition, the following special conditions are

15 imposed.  You should not incur any new credit charges or open

16 additional lines of credit without the approval of the

17 probation office unless you are in compliance with the

18 installment payment schedule.

19         Number two, you shall provide the probation officer

20 with access to any requested financial information.

21         Number 3, you shall submit your person, house,

22 residence, vehicle, papers, property, electronic communication

23 devices, or office to a search conducted by a United States

24 Probation Officer.  Failure to submit to a search may be

25 grounds for revocation of release.  You shall warn any other

1   occupants that the premises may be subject to searches pursuant

2   to this condition.  An officer may conduct a search pursuant to

3   this condition only when reasonable suspicion exists that you

4   have violated a condition of your supervision and that the

5   areas to be searched contain evidence of this violation.  Any

6   search must be conducted at a reasonable time and in a

7   reasonable manner.

8          It is further ordered that you pay a special

9   assessment fee of $100, which is mandatory and due immediately.

10         The court notes that if it erred in the calculation of

11  the sentencing guidelines, the court would have imposed the

12  same sentence as a variance based on the offense conduct in

13  this case, the characteristics of the defendant, and the other

14  factors found in 18 United States Code Section 3553.

15         The defendant will be remanded to the custody of the

16  United States Marshal Service to await designation by the

17  Bureau of Prisons.

18         Is there a request that the court recommend to the

19  Bureau of Prisons a particular prison for -- for the service of

20  this sentence?

21         MR. PATE:  Yes, Your Honor.  Thank you.  Given Mr.

22  Sims' ties to this community and facilities available at Yazoo

23  City, we would request the court recommend that to the BOP.

24         THE COURT:  The court will recommend the Yazoo City

25  facility for the defendant's place of incarceration.  That will

1  be the sentence of the court.  Does the government have any

2  further with this matter today?

3          MR. WANSLEY:  Only that due to the variance, Your

4  Honor, the United States Attorney's office does object on

5  procedural and substantial grounds of the departure of the

6  variance and just want to place that on the record.

7          THE COURT:  Anything further from the defendant?

8          MR. PATE:  No, Your Honor.

9          THE COURT:  All right.  If there's nothing further,

10  the marshals will continue to detain the defendant and --

11          THE DEFENDANT:  Thank you, Your Honor.

12          THE COURT:  All right.

13          MR. WANSLEY:  One more -- I guess one more thing, Your

14  Honor, that the government does dismiss the remaining counts as

15  to this defendant.

16          THE COURT:  All right.  That dismissal will be

17  granted.  And if the government will provide the court with an

18  order, I will sign it.

19          MR. WANSLEY:  Yes, Your Honor.

20          THE COURT:  Anything further from the defendant?

21          MR. PATE:  No, Your Honor.  Thank you.

22          THE COURT:  If not, that will conclude this matter for

23  today and court has at matter scheduled at 2:30.  Court will

24  stand in recess until 2:30.

25      (Hearing Concluded)

1                    CERTIFICATE OF REPORTER

2

3        I, CHERIE GALLASPY BOND, Official Court Reporter, United

4   States District Court, Southern District of Mississippi, do

5   hereby certify that the above and foregoing pages contain a

6   full, true and correct transcript of the proceedings had in the

7   aforenamed case at the time and place indicated, which

8   proceedings were recorded by me to the best of my skill and

9   ability.

10        I certify that the transcript fees and format comply

11   with those prescribed by the Court and Judicial Conference of

12   the United States.

13

14        This the 18th day of September, 2018.

15

16                         s/ *Cherie G. Bond*
                         Cherie G. Bond
17                         Court Reporter

18

19

20

21

22

23

24

25