IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA

VS.                              CRIMINAL NO. 3:16CR71-WHB-LRA-1

ALLEN SIMS




**HEARING ON MOTION TO SUPPRESS**




BEFORE THE HONORABLE WILLIAM H. BARBOUR, JR.
UNITED STATES DISTRICT JUDGE
NOVEMBER 11TH, 2017
JACKSON, MISSISSIPPI




APPEARANCES:

FOR THE GOVERNMENT:   MR. JERRY L. RUSHING

FOR THE DEFENDANT:    MR. PAGE A. PATE
                      MR. E. CARLOS TANNER


REPORTED BY:  MARY VIRGINIA "Gina" MORRIS, RMR, CRR
_____
402 Autumn Creek Drive
Ridgeland, Mississippi  39157
(601) 613-6135

```
 1                       TABLE OF CONTENTS
 2   DARYL HUHN
```

 3     Direct Examination By Mr. Rushing  ...................5

 4       Exhibits G-1, G-2 AND G-3   ........................7

 5       Exhibits G-8(A) THROUGH G-8(D)   ..................22

 6       Exhibit G-4(B)   ..................................22

 7       Exhibit G-4(A)   ..................................27

 8       Exhibits G-5, G-6 AND G-7   .......................28

 9     Cross-Examination By Mr. Pate  ......................29

10     Redirect Examination By Mr. Rushing  ...............63

```
11   RICHARD WRIGHT
```

12     Direct Examination By Mr. Rushing  .................65

13       Exhibit G-11   ...................................67

14     Cross-Examination By Mr. Pate  .....................73

15     Redirect Examination By Mr. Rushing  ...............83

```
16   ERIC PEACOCK
```

17     Direct Examination By Mr. Rushing  .................84

18       Exhibit G-10   ...................................85

19     Cross-Examination By Mr. Pate  .....................91

```
20   JOE WALKER
```

21     Direct Examination By Mr. Rushing  .................98

22     Cross-Examination By Mr. Pate  ....................100

23       Exhibit G-9   ...................................102

24       Exhibit G-12   ..................................102

```
25
```

```
1              THE COURT:  All right.  Be seated.

2              All right, Mr. Rushing.  Do you have a matter for the

3    court this morning?

4              MR. RUSHING:  We do, Your Honor.

5              THE COURT:  Afternoon is where we are.

6              MR. RUSHING:  Yes, sir.  On the docket this afternoon

7    is United States v. Allen Sims.  It's cause number

8    3:16cr71-WHB-LRA.  Mr. Sims is present before the court today

9    with his attorneys, the Honorable Carlos Tanner and the

10   Honorable Mr. Page.

11             MR. PATE:  Page Pate, Your Honor.  Good afternoon.

12             THE COURT:  Yes, sir, Mr. Pate.  Glad to have you in

13   my courtroom.  I know Mr. Tanner.  He's been around awhile.

14   Switched sides.

15             MR. RUSHING:  We're here today for a motion to

16   suppress a telephone intercept and also a motion to suppress

17   two search warrants, Your Honor.  And the government is ready,

18   Your Honor.

19             THE COURT:  All right.  Which one do we want to

20   address first?

21             MR. RUSHING:  I think probably, Your Honor, the

22   Title III wire intercept would probably be the best one to go

23   with first, because the search warrants occurred after the

24   Title III search warrants.

25             MR. PATE:  I would agree with that, Your Honor.
```

1    THE COURT:  All right.  Mr. Pate, you have prepared

2  the motion, Defendant Sim's memorandum of law in support of his

3  motion to suppress intercepted communications.  Is that the one

4  you want to take up first?

5    MR. PATE:  Yes, Your Honor, if it please the court.

6    THE COURT:  All right.  And that follows the motion.

7  So is anybody going to present any evidence in regard to either

8  of these motions today?

9    MR. RUSHING:  I do, Your Honor.  I have some witnesses

10  for that.

11    THE COURT:  All right.  The government I guess has the

12  burden of moving forward.

13    MR. RUSHING:  Yes, Your Honor.  I'll be glad to call

14  my witnesses first, Your Honor.

15    THE COURT:  Who do you call?

16    MR. RUSHING:  Your Honor, we first call Daryl Huhn.

17    MR. PATE:  Your Honor, if I may, I think a lot of

18  testimony may relate to both motions.  So if it please the

19  court, if I could go ahead and ask questions relevant to the

20  second motion it may save some time.

21    MR. RUSHING:  No objection by the government, Your

22  Honor.

23    THE COURT:  All right.  Is everything you're going to

24  present applicable to both motions, or are you going to have

25  separate evidence on the second motion?

1    MR. RUSHING:  I've got separate evidence on the second

2  motion, but they kind of tie in together because this motion to

3  suppress the search warrants also is based on this motion to

4  suppress the wire intercept also, Your Honor.

5    THE COURT:  All right.

6    MR. RUSHING:  What I thought I'd do, I'd go into the

7  wire intercept first, discuss that with Mr. Huhn and then go

8  into the two search warrants.

9    THE COURT:  All right.  Do we want to complete all of

10 the evidence before you argue the two motions?

11   MR. RUSHING:  Yes, Your Honor.

12   MR. PATE:  Absolutely.

13   THE COURT:  All right.  Well, we'll take the

14 government's evidence first, and then Mr. Pate may

15 cross-examine the witnesses as they are completed by the

16 government.

17   MR. RUSHING:  Thank you, Your Honor.  The government

18 calls Daryl Huhn, Your Honor.

19  (WITNESS WAS ADMINISTERED THE OATH)

20   MR. RUSHING:  Please the court.

21   THE COURT:  Yes, sir.

22                    **DARYL HUHN,**

23 having first been duly sworn, testified as follows:

24                  **DIRECT EXAMINATION**

25 BY MR. RUSHING:

1   Q.  Would you state your name for the record, please, sir.

2   A.  My name is Daryl Huhn.

3   Q.  Now, Mr. Huhn, where are you employed?

4   A.  I'm employed by the Drug Enforcement Administration.

5   Q.  And in what capacity?

6   A.  I'm a special agent.

7   Q.  And were you working in that capacity back in November of

8   2015?

9   A.  Yes, I was.

10  Q.  And did you file for a Title III wire intercept on a phone

11  listed as target telephone number 16.  Is that correct?

12  A.  Yes, sir.

13      (OFF-RECORD DISCUSSION)

14  Q.  Target telephone number 16.  Is that correct?

15  A.  Yes, sir.

16  Q.  And did you, in fact, receive -- did you file an

17  application for the interception and also obtain a wire

18  intercept for that phone?

19  A.  Yes, sir.

20          MR. RUSHING:  Your Honor, at this time the government

21  would offer Exhibits 1, which is the application authorizing

22  the interception of the search warrant, Exhibit 2, which is the

23  affidavit with that application, Exhibit 3, which is the order

24  for that wire intercept at this time, Your Honor.

25          MR. PATE:  No objection, Your Honor.

```
 1              THE COURT:  All right.  Exhibit 1, the application,
 2   Exhibit 2 is the affidavit, and Number 3 is the order, all
 3   applicable to the wire intercept.  Exhibits 1, 2, and 3 are
 4   received into evidence without objection.
 5        (EXHIBITS G-1, G-2 AND G-3 MARKED)
 6              MR. RUSHING:  Thank you, Your Honor.
 7   BY MR. RUSHING:
 8   Q.  Mr. Huhn, in the affidavit itself did you actually list
 9   information which you believe to be probable cause for the
10   issuance of the actual wire intercept?
11   A.  I did.
12   Q.  And as part of that, on I believe page 20 of that
13   affidavit, did you discuss Mr. Sims' prior convictions?
14   A.  I did.
15              THE WITNESS:  Your Honor, may I look at my affidavit
16   for reflection?
17              THE COURT:  Yes, you may.  Do you have it there?
18              THE WITNESS:  I do, yes, sir.
19              MR. RUSHING:  May I approach with the exhibit, Your
20   Honor?
21              THE COURT:  Yes, sir.
22   BY MR. RUSHING:
23   Q.  I believe I asked you, on the affidavit itself did you --
24   on page 20, paragraph N, did you actually list the convictions
25   of Mr. Sims?
```

1  A.  We listed the instances where Mr. Sims was arrested and the

2  dispositions when known.

3              THE COURT:  All right.  Both of you are going to have

4  to speak up a little louder for me.

5              MR. RUSHING:  Can you turn the microphone up a little

6  bit?

7              THE COURT:  The affidavit is Exhibit 2.

8              MR. RUSHING:  Yes, Your Honor.

9              THE COURT:  Page 20.

10              MR. RUSHING:  And paragraph N, Your Honor.

11  BY MR. RUSHING:

12  Q.  Did you list the arrest of Mr. Sims as well as his actual

13  convictions?

14  A.  Yes, sir.

15  Q.  And did that paragraph reflect those convictions also?

16  A.  Yes, sir.

17  Q.  And do some of those convictions involve the possession or

18  distribution of controlled substances?

19  A.  They do.

20  Q.  Also in the affidavit, on page 34 at paragraph 20, I

21  believe you made a statement about Mr. Sims being a -- known to

22  import and distribute drugs.  Is that correct?

23  A.  Yes, sir.

24  Q.  And I particularly call your attention to page 39 of

25  paragraph 30 and 31.  And I believe on that paragraphs, do you

1  talk about a conversation between a person by the name of

2  Salazar and a person by the name of Louie?

3  A.  Yes, sir, we do.

4  Q.  And what was the purpose of putting that paragraph into the

5  affidavit?

6  A.  The purpose of placing that conversation into the affidavit

7  showed that Mr. Salazar, Mr. Louie were, in fact, using a

8  cellular telephone to arrange for drug transactions or for

9  future drug transactions and listed both of their phone numbers

10  associated with their -- with their names and the conversation.

11  Q.  And did the affidavit also provide that the target

12  telephone 6 *(sic)* that you were trying to do the intercepts on

13  of Mr. Sims having been in contact with Louie's phone?

14  A.  Yes, sir.  Target telephone 16 was, in fact, in

15  communication with Mr. Louie.

16  Q.  On the conversation on paragraph 30 and 31, does that

17  conversation -- and do you set forth in that actual affidavit

18  the conversation concerning what you believe to be controlled

19  substance violations?

20  A.  Yes, sir, I do.

21  Q.  And what do you describe in the affidavit about that?

22  A.  During the conversation, Mr. Louie talks about having his

23  own truck, having his own authority and having bought a new

24  truck.  Later in the conversation, Mr. Salazar talks about the

25  "Christina," the "Chine,"  "White Girl," which we know to be

1    the Chino, China white heroin.  The White Girl is known as

2    cocaine HCL.

3        They also -- Mr. Louie asks about the green one, to which

4    Mr. Salazar replies, no, nobody has that right now,

5    paraphrasing, obviously.  The information that Mr. Salazar

6    provides to Mr. Louie coupled with Mr. Louie's statement of

7    having a truck leads agents to believe that Mr. Louie is, in

8    fact, attempting to arrange to take possession of narcotics and

9    to transport them himself in his truck.

10   Q.  Now, you said that the -- in the affidavit also you talk

11   about telephone 16 being in contact with the person identified

12   as Louie?

13   A.  Yes, sir.

14   Q.  And on paragraphs 22 and 33 of your affidavit I believe you

15   talk about Mr. Holiday and about some text messages concerning

16   some photographs.  Is that correct?

17   A.  Correct.

18   Q.  And what was the purpose of that in the affidavit?

19   A.  A previous target telephone had revealed that Mr. Holiday

20   had been in touch with another individual known as Mr. Rhodes

21   and had, in fact, sent him an MMS or also a picture text which

22   contained what appeared to be five kilograms wrapped in duct

23   tape that were on a counter next to a digital scale.

24   Q.  At that time period did y'all have a wire intercept on

25   Mr. Holiday's phone?

1    A.   Correct.  Yes, sir.

2    Q.   Can you recall what number that target telephone was?

3    A.   Which?  The ---

4    Q.   Mr. Holiday's phone.

5    A.   Holiday's?  I don't know the exact telephone number.  Are

6    you asking me the target telephone number?

7    Q.   Yes, sir.

8    A.   It's going to be target telephone -- it's either 10 or 9.

9    It's target telephone 10 would be Mr. Holiday.

10   Q.   Now, on paragraph 38 of the affidavit I believe you have in

11   there a conversation between Mr. Holiday and target telephone

12   16 which you believed at that time to be in the possession of

13   Mr. Sims.  Is that correct?

14   A.   Correct.

15   Q.   And what was the purpose of that particular phone call

16   being in the affidavit?

17   A.   This particular phone call, Mr. Sims and Mr. Holiday talk

18   about -- more explicitly, Mr. Holiday talks to Mr. Sims about,

19   quote, oh, okay.  Yeah.  It's cool for me to goddamn it do like

20   three four, to which Mr. Sims replied, "Yeah, yeah.  Do as many

21   as you want to do."

22        Agents take the "three four" as being a price.  The going

23   rate for a kilogram of cocaine in the Jackson area is anywhere

24   between 32,000 and 36,000 dollars per kilogram.

25   Q.   Was that reflected in your affidavit also?

1    A.  It is, yes, sir.  Mr. Sims follows that response up with,

2    basically, "That's when you get into some real money, some

3    quicker money, less hard work and more profit then you'll see.

4    Mr. Holiday then informs Mr. Sims that he has some other work

5    that he wants to get rid of.  And by "other work" he's

6    referring to what we believe is marijuana.

7        He says that he has like 200 more, which agents are -- we

8    believe was 200 pounds of marijuana that he is, in fact,

9    selling for $750 per pound when he refers to -- he says, "I

10   mean, I'm talking about still stuck," which means that he's

11   having a difficult time getting rid of the 200 pounds of

12   marijuana.  And he says, "I done went all the way down to 750."

13   He then talks about selling as many as he can to some country

14   boys.

15       He then arranges with Mr. Sims to attempt to have

16   everything ready to go for the following week when he says,

17   "Hell, yeah.  So want, uh, on the seven hun probably like next

18   week, early next week."  Mr. Sims replies, "Yeah."

19       Mr. Holiday then talks about getting all of his money

20   together to be ready for the purchase.  He says, "Oh, okay,

21   because I want to have all my change chips and shit together,

22   get that shit out of the way."  Historically, what we have

23   found is that, you know --

24   Q.  Let me ask you this.  Is that reflected in your synopsis of

25   that call also?

1    A.   Yes, sir, it is.

2    Q.   Okay, sir.  Now, at the end of that conversation is there

3    any conversation about Mr. Hol -- Mr. Holiday, rather, wanting

4    anything else from Mr. Sims?

5    A.   Toward the end of the conversation, yes, sir.  Mr. Holiday

6    talks to Mr. Sims again and says, basically, bring some smoke,

7    meaning marijuana, whenever he comes to see him.

8    Q.   And did you consider that to be a dirty phone call on

9    target telephone number 16?  Is that correct?

10   A.   Yes, sir.

11   Q.   Now, in paragraph 39 I believe you have a toll analysis of

12   target telephone 16.  Is that correct?

13   A.   That's correct.

14   Q.   And what was the purpose of putting the toll -- phone toll

15   information for target telephone 16 in your affidavit?

16   A.   The purpose for the pin register toll information section

17   is to show that the target telephone is talking to more than

18   just the original person known to be talking on that phone, for

19   instance, that Mr. Sims was talking to more than just

20   Mr. Holiday on that target telephone.

21   Q.   And do you have any conversations or toll records where

22   he's calling or talking back to a person by the name of Louie

23   which you identified earlier in your affidavit?

24   A.   Correct.  We have approximately 12 phone calls and four

25   text messages.

1  Q.  And at that time were you familiar about where the -- where

2  the drugs were coming from, what location?

3  A.  At that time we could -- we did not know definitively where

4  the narcotics were coming from but that they were more than

5  likely coming from Mexico.

6  Q.  Did you include in your toll analysis any phone calls from

7  target telephone 16 of Mr. Sims to any numbers in Mexico?  Or

8  do you recall?

9  A.  Well, we didn't list actual -- a number of phone calls or

10  text messages to foreign numbers, but only that that phone was,

11  in fact, in contact with the phone number which appeared to be

12  sourced out of Mexico.

13  Q.  Now, also in your affidavit you -- I believe paragraphs 51

14  through 70, did you set forth the reasons you thought that

15  you -- or the necessity for the actual issuance of the

16  Title III wire intercept?

17  A.  Yes, sir.

18  Q.  And on starting at paragraph -- or page 51, rather, now,

19  through, I think pages 70, did you set forth the explicit

20  language concerning your actual reason other -- listing other

21  investigative techniques you had tried or investigative

22  techniques you thought would not be feasible in this matter?

23  A.  Yes, sir, we did.

24  Q.  And are they set forth in pages 51 through 70?

25  A.  Yes, sir.

1  Q.  And in those paragraphs did you explain to the court the

2  necessity for issuing the Title III wire intercept?

3  A.  I did.

4  Q.  After you actually prepared the affidavit, did you take it

5  to any district court judge?

6  A.  Yes, sir.

7  Q.  And who was that, sir?

8  A.  That was Judge Wingate.

9  Q.  And did he authorize the intercept of target telephone 16

10  based upon your affidavit and application?

11  A.  Yes, sir.

12  Q.  How long did the actual wire -- or when did the wire

13  actually go down?

14  A.  The wire was deactivated on December the 1st at

15  approximately 11:59 p.m.

16  Q.  And is that at night?

17  A.  Yes, sir.

18  Q.  Now, after the wire was actually approved by the court and

19  y'all began -- before you began interceptions, were you advised

20  to your rights concerning minimization and all too?

21  A.  Yes, sir.

22  Q.  And when was it that you said the actual wire went down?

23  A.  The wire was deactivated December the 1st at approximately

24  11:59 p.m., 2015.

25  Q.  Now, the listening post for the wire, where is that located

1    at the time it was done?

2    A.   The actual listening post is in Jackson, Mississippi.

3    Q.   And do you have any affiliation with New Orleans,

4    Louisiana, concerning the DEA down there?

5    A.   Yes, sir.  New Orleans is our district office.

6    Q.   And what happens when you did a wire intercept in

7    Mississippi concerning a phone here in Mississippi?

8    A.   The communications are -- actually go through the routing

9    of New Orleans, our district office, and they maintain that

10   copy.  And then we are listening, basically, realtime behind

11   it.  However, we don't -- we don't have the storage of the

12   disc.

13   Q.   And when the wire went down, who actually makes a copy of

14   the recordings from that wire?

15   A.   That would be from the tech in New Orleans field division.

16   Q.   And is that a true and correct copy of the actual

17   conversations intercept over target telephone 16 to the time

18   period of the actual Title III wire intercept?

19   A.   Yes, sir, it is.

20   Q.   When the agent there made the actual recording, what did he

21   do with it?

22   A.   That agent pulled the disc on December the 2nd.  He took it

23   and he sealed it in an evidence envelope and then transferred

24   it to our custody.

25   Q.   And you mean "he sealed it," can you explain how he sealed

1  it?

2  A.  Sure.  So it's -- we have a clear evidence bag and he takes

3  it -- it's on a Blu-Ray Disc where he downloads it in

4  electronic format, places it inside of that clear bag, the

5  clear evidence bag, and then heat-seals it so that it's tamper

6  proof so if anyone goes in it, you would have had to have

7  broken one of the seals or torn the bag open.

8  Q.  And you said he mailed it out on the 2nd of December.  Is

9  that correct?

10  A.  Correct.

11  Q.  And when did y'all receive that actual compact disc

12  containing the wire intercepts?

13  A.  It was overnighted to us on the 2nd and we received it on

14  the afternoon of the 3rd.

15  Q.  Do you recall what time it was on the 3rd that you actually

16  received it?

17  A.  I don't know the exact time that it was received, but it

18  was -- after it was received Special Agent Jeremiah Rayner

19  actually took custody of the package, as witnessed by me; and

20  we transferred it into the temporary storage at the Jackson

21  district office at approximately 4 -- 4 p.m., 4:30.

22  Q.  And did it remain in that, I guess, sealed condition at

23  that time also?

24  A.  Yes, sir.

25  Q.  And what happened on the 3rd, I guess, which is a Friday?

1    Is that correct?

2    A.  I believe the 3rd was a Thursday.  4th is a Friday.  Yes,

3    sir.

4    Q.  What happened on the 4th?

5    A.  All right.  On the 4th, so we were in the middle of search

6    warrants, processing evidence, processing financial

7    instruments.  We have a certain amount of time that we have to

8    have those to the -- to Loomis to be counted and that sort of

9    thing.  So we were cleaning up behind search warrants.

10   Q.  And that would have been on the 5th.  Is that right?  I

11   mean the 4th, I mean.

12   A.  Yes, sir.

13   Q.  And the 5th and the 6th were actually weekends.  Is that

14   correct?

15   A.  Correct.

16   Q.  And on the 7th -- on December the 7th what, if anything,

17   happened then?

18   A.  On the 7th we were in communication with AUSA Rushing in

19   order to schedule to get the T III sealed by a judge.

20   Q.  And did, in fact -- and, of course, that would be me.  Is

21   that correct?

22   A.  Correct, sir.

23   Q.  Did I send you an e-mail concerning the wires?

24   A.  Yes, sir.

25   Q.  And did --

1           MR. RUSHING:  May I approach the witness, Your Honor?

2           THE COURT:  Yes, sir.

3    BY MR. RUSHING:

4    Q.  I've handed you Exhibit, I believe, 8(a).  And what is the

5    last exhibit on that?

6    A.  It's 8 alpha.

7    Q.  And there's additionals behind it.  Give me the last number

8    on that one.

9    A.  Looks like 8 delta.

10   Q.  8(d)?

11   A.  (d), yes, sir.

12   Q.  Okay.  And 8(a), first, what is 8(a)?

13   A.  8(a) is a copy of an e-mail from Jerry Rushing to myself

14   and reply.

15   Q.  And what's the inquiry for that?  What's the letter about?

16   A.  This is an e-mail from you asking when we can have the disc

17   sealed.

18   Q.  And did you make a reply to that or not?

19   A.  Yes, sir.  The reply was basically -- it says, "I can go to

20   the judge any day.  I'm available all week."

21   Q.  Do you recall what time that was actually sent?  Does it

22   show a date or time, rather?

23   A.  It does.  It shows the conversation was initiated at 1:01

24   p.m. and the reply back was at 1:06 p.m.

25   Q.  And when -- and is there a time later that you were again

1    contacted by me or I contacted you?

2    A.   Yes.

3    Q.   And when was that, sir?

4    A.   That would be on December the 10th.  You e-mailed -- you

5    e-mailed me and said that the judge could see us the following

6    day at 11:30.

7    Q.   Did I also send you an e-mail concerning where I was --

8    where I was out on the 7th and the 8th also?

9    A.   Yes, sir.  You had stated that you had been out for the

10   last two days.

11   Q.   That would be the 7th and the 8th.

12   A.   I think that's --

13   Q.   The 8th --

14   A.   -- the 8th and the 9th.

15   Q.   Okay.  So I was out the 8th and the 9th.

16   A.   Correct, sir.

17   Q.   And then on the 10th did I send you an e-mail?

18   A.   You did.

19   Q.   Concerning what, sir?

20   A.   On the 10th was an e-mail stating that the judge would be

21   available the following day at 11:30.

22   Q.   And what happened the next day?

23   A.   The next day Special Agent Rayner, as witnessed by myself,

24   removed the T III disc from nondrug storage and I transported

25   it to the courthouse, to here.  And I met with you in front of

1    Judge Wingate.

2    Q.  And when you actually met with me and Judge Wingate, did

3    you have the CD -- actual CD recordings of the wire intercepts?

4    A.  Yes, sir.  It's a Blu-Ray Disc, still located inside of the

5    heat-sealed evidence bag.

6    Q.  And was the bag still sealed at that time also?

7    A.  Yes, sir, it was.

8    Q.  And what did you have to do to transfer that sealed

9    document into another one for the judge to sign?

10   A.  At that time I cut the -- cut the bag open and removed the

11   Blu-Ray Disc, placed it inside of a manila envelope, at which

12   time we sealed that manila envelope, and Judge Wingate signed

13   the seal on that envelope.

14   Q.  Is that when he signed the sealing order also?

15   A.  Yes, sir.

16        MR. RUSHING:  Judge, I have Exhibit Number -- let me

17   do this first.

18   BY MR. RUSHING:

19   Q.  You have 8(a) through (d).  Is that correct?

20   A.  Yes, sir.

21        MR. RUSHING:  We move for Exhibit 8(a) through (d) be

22   admitted into evidence for this proceeding only, of course.

23        MR. PATE:  No objection, Your Honor.

24        THE COURT:  All right.  8(a) through 8(d) will be

25   received into evidence.

```
 1        (EXHIBITS G-8(A) THROUGH G-8(D) MARKED)

 2   BY MR. RUSHING:

 3   Q.  I believe you -- I've asked you did you receive the order

 4   also from the court to seal those records.

 5   A.  Yes, sir.

 6        MR. RUSHING:  And I have it marked I believe 4(b)

 7   here, Your Honor, a copy of the actual order sealing the actual

 8   Title III wire intercept.  We'd move to make that part of the

 9   record also, Your Honor.

10        MR. PATE:  No objection to that, Your Honor.

11        THE COURT:  4(b) will be received into evidence.

12        (EXHIBIT G-4(B) MARKED)

13   BY MR. RUSHING:

14   Q.  Why did y'all put the actual recording on a Blu-Ray Disc?

15   A.  A Blu-Ray Disc is -- it can handle more information than a

16   normal, you know, CD or a DVD.  And they're not as expensive or

17   hard to find as the terabyte -- terabyte disks that were -- had

18   been previously used.

19   Q.  From the time that y'all made the actual recording until

20   such time as Judge Wingate signed the order sealing that --

21   those recordings, did anybody alter, modify or correct those

22   recordings?

23   A.  No, sir.

24   Q.  Did it stay sealed from the time that you received it until

25   such time as you gave it to Judge Wingate?
```

1    A.  Yes, sir.

2    Q.  I believe also before you actually began monitoring the

3    Title III wire intercept, did you have a conversation with me

4    concerning minimization?

5    A.  Yes, sir.

6              MR. RUSHING:  May I approach, Your Honor?

7              THE COURT:  Yes, sir.

8    BY MR. RUSHING:

9    Q.  And if you would give me the exhibit number that you've got

10   there in front of you.

11   A.  It's 4(a).

12   Q.  And what is that, sir?

13   A.  This is the minimization instructions.

14   Q.  And is that the copy of the actual minimization

15   instructions that y'all had in your possession at the DEA?

16   A.  Yes, sir.

17   Q.  And what does that actually do?

18   A.  The minimization instructions is a -- basically, a set of

19   instructions for the monitors for the phone calls that are

20   intercepted over the target telephone of which ones can be

21   listened to and which ones need to be minimized, as we call it,

22   or turned off.

23   Q.  Does it also on that particular document there advise the

24   requirements of minimization?

25   A.  Yes, sir, it does.

1  Q.  And does it provide a time period when you can actually

2  monitor an actual conversation to see if it's criminal in

3  nature or not?

4  A.  Yes, sir, it does.

5  Q.  And how many -- do you know how many minutes it says it is?

6  A.  Yes, sir.  It says not to exceed two minutes.

7  Q.  And does it also provide for allowing spot-checking too?

8  A.  Yes, sir, spot-checking with approximately one minute or no

9  less than one minute.

10  Q.  And what is spot-checking?

11  A.  Spot-checking, so at the onset of a phone call we have up

12  to two minutes to determine if it's criminal in nature or if

13  it's what we consider to be non-pertinent, at which time it

14  would be minimized.  We leave the phone call minimized for

15  approximately -- or at least one minute and then can go back

16  and spot-check, what we call it, listen to a portion of that

17  phone call to determine if it has progressed into criminal

18  nature or not.  And if it hasn't, again we minimize, wait

19  another minute and then proceed.

20  Q.  Now, there's a particular call that was -- that's in

21  question in a motion to suppress.  Did you become aware of that

22  one, sir?

23  A.  Yes, sir.

24  Q.  And was that I believe call session number 2345, or do you

25  recall?

```
 1    A.  I'm not sure of the call session.

 2    Q.  There's a conversation concerning Herrin-Gear back on

 3    November 13th of 2015?

 4    A.  That sounds correct.

 5    Q.  Sir?

 6    A.  Yes, sir.

 7            MR. RUSHING:  May I approach the witness, Your Honor?

 8            THE COURT:  Yes.

 9    BY MR. RUSHING:

10    Q.  I've handed you what I've marked as Exhibit 9.  Is that

11    correct?

12    A.  Yes, sir.

13    Q.  And what is Exhibit 9?

14    A.  Exhibit 9 is a copy of call session number 2345.

15    Q.  And what does that call session talk about?

16    A.  During this specific call session the -- Mr. Sims contacted

17    Herrin-Gear here in Jackson and spoke with a customer

18    representative there.

19    Q.  And was that call minimized?

20    A.  It was not.

21    Q.  And why is that, sir?

22    A.  The call in itself -- the target contacted a vehicle -- a

23    vehicle sales company, if you will.  So it's part of the

24    financial side of the investigation to determine spending, to

25    determine a place where a target may place money inside of a
```

1   vehicle or, you know, in a vehicle kind of a thing.

2   Q.  And did your actual application in this matter provide as

3   far as the actual -- you have to list certain crimes that

4   you're actually investigating.  Is that correct?

5   A.  Yes, sir.

6   Q.  That you're allowed to listen to conversations involving

7   those particular crimes listed.  Is that correct?

8   A.  Correct.

9   Q.  Did the application list a 1956 money laundering violation

10  or a 1957 money laundering violation?

11  A.  Yes, sir.

12  Q.  And why were you looking for money laundering violations of

13  the defendants for that particular phone?

14  A.  For a couple of different reasons.  Number one is for

15  asset -- asset forfeiture purposes.  Obviously, the second one

16  is to basically show that the defendant's spending is far and

17  away higher than his income.

18  Q.  In your investigation of money laundering do you -- as far

19  as actual people you've investigated before, do they do certain

20  things with their income from the unlawful distribution of

21  controlled substances?

22  A.  Yes, sir.

23  Q.  And what is that?

24  A.  They purchase extravagant vehicles.  They buy properties or

25  invest in those type of items.

1    Q.  Is that why that particular phone call on November 13th,

2    2015, was not minimized?

3    A.  Yes, sir.

4    Q.  And on the actual exhibit there with the directions of

5    minimization, what's the exhibit number, again?

6    A.  It's 4(a).

7         MR. RUSHING:  Did we move that into evidence at this

8    point in time yet?

9         MR. PATE:  No objection, Your Honor.

10         THE COURT:  Exhibit 4(a) will be received into

11    evidence.

12    (EXHIBIT G-4(A) MARKED)

13    BY MR. RUSHING:

14    Q.  And before they actually began monitoring the wire

15    intercepts, does that memorandum also advise them they're

16    actually to read the affidavit, the application and the order

17    before doing so?

18    A.  Yes, sir.

19    Q.  Does that also list the particular crimes that are being

20    investigated on that Title III wire intercept?

21    A.  Yes, sir, it does.

22    Q.  And do the people actually -- or the monitors have to sign

23    off approving, meaning they've read those documents?

24    A.  Yes, sir, they do.

25    Q.  And do you recall whether or not an AUSA actually did an

1    oral presentation concerning those minimization requirements?

2    A.  Yes, sir, you did.

3             MR. RUSHING:  Your Honor, I have also Exhibit Number 5

4    which is the application authorizing a continued interception

5    of telephone 16 and 17, dated January 28th, 2016, Exhibit 5,

6    Your Honor.  Exhibit 6 is the affidavit for that wire

7    intercept.  And Exhibit 7 is the order authorizing the

8    electronic intercepts of that phone and the continuation of

9    target telephone 16, Your Honor.  I'd move to have those

10   admitted into evidence for this hearing only, of course.

11            THE COURT:  G-5, G-6?

12            MR. RUSHING:  G-5, G-6, and G-7, Your Honor.

13            THE COURT:  All right.  5, 6 and 7 --

14            MR. PATE:  No objection, Your Honor.

15            THE COURT:  -- will be received into evidence.

16       (EXHIBITS G-5, G-6 AND G-7 MARKED)

17            MR. RUSHING:  Tender the witness, Your Honor.

18            MR. PATE:  May it please the court.

19            THE COURT:  All right.  Give me just one second.  Let

20   me catch up.

21            MR. PATE:  Yes, sir.

22       (PAUSE)

23            THE COURT:  Okay.  Mr. Pate, you may --

24            MR. PATE:  Thank you, Your Honor.

25                         **CROSS-EXAMINATION**

1    BY MR. PATE:

2    Q.  Agent Huhn, good afternoon.

3    A.  Good afternoon, sir.

4    Q.  You had testified earlier about seeking an application

5    authorizing a wiretap specifically for target telephone 16.  Do

6    you recall that testimony?

7    A.  Yes, sir, I do.

8    Q.  And I believe we identified as Exhibit 1 the actual

9    application itself.  Do you have that in front of you?

10   A.  Yes, sir, I do.

11   Q.  Okay.  And is it fair to say that that application was

12   filed with the court on November 2nd of 2015?

13   A.  I'm not sure.  I have the affidavit in support of an

14   application.  I don't think I have the actual application, but

15   that was filed on November the 2nd of 2015.

16   Q.  Okay.  Your application was filed at the same time you

17   filed the affidavit?

18   A.  Correct.

19   Q.  Okay.  And that was November 2nd of 2015?

20   A.  Yes, sir.

21   Q.  And what was your role in the investigation at that point?

22   A.  I was a co-case agent.

23   Q.  Were there other agents working on the case with you?

24   A.  Yes, sir.  There were multiple.

25   Q.  Did you have primary responsibility for the investigation

1  or would you consider yourself kind of in a second chair or

2  second position?

3  A.  We're not really a kind of group designed to have different

4  roles as what you were suggesting.  We're all pretty much

5  burdened with trying to take on a leadership role in the

6  investigation.  We're a very small group I guess I should say.

7  So it was myself and one other agent listed as the actual

8  specific case agents, but the other guys are just as involved.

9  Q.  Okay.  And it's fair to say this particular investigation

10  had been going on for some time prior to November 2nd of 2015.

11  Correct?

12  A.  Yes, sir.

13  Q.  I mean, this particular target telephone was number 16.

14  Right?

15  A.  Yes, sir.

16  Q.  And I believe in the affidavit, which is Exhibit 2, you

17  list a variety of different applications for wiretaps that had

18  preceded or predated Exhibit 2.  Correct?

19  A.  Yes, sir.

20  Q.  Based on your recollection and your involvement in this

21  investigation, when did this investigation begin, at least with

22  your involvement?

23  A.  This investigation began in September of 2014.

24  Q.  So over a year prior to the application that's in Exhibit 1

25  and Exhibit 2.

1  A.  Prior to target telephone 16, yes, sir.

2  Q.  During that yearlong period, any of the phone calls that

3  you were monitoring, did any of them reference Allen Sims?

4  A.  From September of 2014 to November the 2nd of 2015?

5  Q.  Good point.  Were there any references to Allen Sims from

6  the beginning of your investigation in September of 2014 until

7  September 13 of 2015 when you intercepted a call between

8  Mr. Sims and Mr. Holiday?

9  A.  I don't recall if there were any previous before September

10  the 13th.

11  Q.  Had there been any prior intercepts or any mentions of

12  Mr. Sims' name in calls that you or other agents had been

13  monitoring, do you believe if you had that information you

14  would have put it in your affidavit?

15  A.  I don't think that I can speculate on what I was thinking

16  at the time.  Had we -- are you asking me if we had identified

17  specifically who he was prior to September the 13th, we would

18  have added that?

19  Q.  If you had identified any phone calls where he was a

20  participant or name was mentioned that would have been relevant

21  to your investigation would you have added it to the affidavit?

22  A.  If the phone call would have supported the probable cause,

23  I don't see why we wouldn't have.

24  Q.  And during the yearlong investigation that preceded the

25  filing of this affidavit, had you or any other agent involved

1    in this investigation conducted surveillance on any residence

2    associated with Mr. Sims?

3    A.  Prior to what date, sir?

4    Q.  November 2nd of 2015.

5    A.  Yes, sir, we had.

6    Q.  All right.  And what was the date that surveillance first

7    began?

8    A.  I do not know the specific date.

9    Q.  Is that contained in your affidavit?

10   A.  Specific date that we began physical surveillance?

11   Q.  Yes, sir.

12   A.  You have to give me a minute.

13   Q.  Sure.

14       (WITNESS EXAMINED DOCUMENT)

15   A.  It's not in the -- it's not in the physical -- physical

16   surveillance portion of necessity.  It's not there.  I don't

17   know if it's in the other part of the affidavit.

18   Q.  But you're testifying that you or other agents did, in

19   fact, conduct surveillance of Mr. Sims prior to you applying

20   for this wiretap.

21   A.  Yes.

22   Q.  As it's not in the affidavit, can you explain to the court

23   what type of surveillance you conducted and what you saw?

24   A.  Any type of surveillance -- I can't recall a specific

25   surveillance or day of surveillance, but I think any type of

1    surveillance would be physical surveillance where we'd use

2    multiple platforms to surveil the actions of the target.

3    Q.  Where was it?

4    A.  As I stated, I'm not sure of a specific date other than we

5    would have performed physical surveillance, you know, prior to.

6    Q.  Of what location?

7    A.  As I just stated, I don't know of any specific time or date

8    or -- in this case location.  We had -- we had suspected

9    locations where we thought that the target was, but I don't

10   believe we were sure at that time.

11   Q.  And I'm not trying to trip you up, but you testified there

12   was physical surveillance, but your testimony today is you

13   don't know when and you don't know what it was.

14   A.  Well, sir, on previous applications whenever we watch meets

15   as coordinated through those intercepts, sometimes we're not

16   completely sure who that target is meeting with.

17   Q.  Fair to say.  So you're saying it may have been Mr. Sims.

18   You're not sure.

19   A.  There's no way to go back and tell now.

20   Q.  But it is your testimony that you conducted physical

21   surveillance of him?

22   A.  That we had conducted physical surveillance of Mr. Sims?

23   Yes.

24   Q.  Prior to the application for this wiretap.

25   A.  Yes.

1  Q.  Okay.  But you did not put it in your affidavit.

2  A.  It is not in the necessity portion of the affidavit, no,

3  sir.

4  Q.  Is it in some other portion?

5  A.  Not that I'm aware of.

6  Q.  Let me ask you to turn your attention to paragraph 37 of

7  Exhibit 2.  And, again, that's your affidavit, the first one in

8  support of the wiretap for target telephone 16.  I'll give you

9  a second to get there.

10  A.  Thank you.

11     (WITNESS EXAMINED DOCUMENTS)

12  Q.  Do you have it, sir?

13  A.  Yes, sir.

14  Q.  This portion of your affidavit, is it fair to say it

15  documents a phone call that was recorded between Mr. Holiday

16  and at the time you expected -- or you had believed the other

17  party was Mr. Sims?

18  A.  Yes, sir.

19  Q.  Okay.  And I believe you had testified earlier that you

20  thought Mr. Holiday's phone was target telephone 9 or 10.

21  Reading paragraph 37, does that refresh your recollection about

22  the actual target telephone number for Mr. Holiday?

23  A.  To the best of my recollection, Mr. Holiday had a couple of

24  different phones, I believe.  I'm not -- I don't -- I don't

25  recall that specifically.  But here specifically it says target

1    telephone 12 for Mr. Holiday.

2    Q.  And I just want to be clear.  Was target telephone 12 the

3    one that Mr. Holiday was supposedly using during this phone

4    call you have documented in paragraph 37?

5    A.  Yes, sir.

6    Q.  Okay.  And is it true that that is the first phone call

7    that you document in this affidavit on page 44 that relates to

8    a conversation between anyone and Mr. Sims?

9    A.  That is the first conversation that is spelled out in the

10   affidavit between anyone and Mr. Sims.  Yes, sir.

11   Q.  Were there other conversations you or other agents had

12   intercepted that didn't make their way into this affidavit?

13   A.  I don't recall.

14   Q.  Can you recall any intentional omission of any calls that

15   were intercepted prior to you filing this affidavit where you

16   believe Mr. Sims was a participant?

17   A.  If Mr. Sims had been involved in a call with one of the

18   prior targets over a target telephone -- I don't -- I don't

19   recall whether or not that happened.  I don't know that we

20   would have added it to the affidavit, not being necessary.

21   Q.  Let me ask you to just flip through that phone call as it's

22   documented in your affidavit.  It's a couple of pages there.

23   And then there's a summary sentence contained on page 46, right

24   after the transcript of the call, starting with the sentence --

25   the words, "This call makes reference to Sims discussing with

 1    Holiday."  Do you see that?

 2    A.  Yes, sir.

 3    Q.  Okay.  And did you write that sentence?

 4    A.  Yes, sir, I did.

 5    Q.  Okay.  And is it fair to say that you were describing this

 6    phone call between Mr. Sims and Mr. Holiday as a discussion

 7    about a previous criminal conviction for aggravated assault and

 8    a prison sentence?

 9    A.  Yes, sir.

10    Q.  Is there anything about that phone conversation, which is

11    documented in about two pages of your affidavit, that referred

12    to any drug transaction or any pending drug transaction?

13    A.  No, sir.

14    Q.  There was another call documented in your affidavit

15    beginning at the bottom of that page in paragraph 38.  Do you

16    see that?

17    A.  Yes, sir.

18    Q.  And I believe you've testified earlier to the substance of

19    that call, but you also at the end of that transcript at the

20    bottom of page 48 I believe have a sentence summarizing your

21    impression of that phone call beginning with the words, "During

22    the call Holiday and Sims discussed."  Do you see that?

23    A.  Yes, sir.

24    Q.  And I'll continue on.  You wrote here between -- "During

25    the call, Holiday and Sims discussed Sims wanting to get money

1   to be used to purchase illicit narcotics."  Do you see that?

2   A.  Yes, sir.

3   Q.  And can you point me to what part of this phone call that

4   you believe references Sims wanting to get money to be used to

5   purchase illicit narcotics?

6   A.  Well, in order for drug dealers to make money they have to

7   sell drugs.

8   Q.  Sure.

9   A.  And the more drugs they sell, hypothetically, the more

10  money they make, which would be the reason that most drug

11  dealers do what they do, in my opinion.  So during this

12  conversation, when Mr. Holiday confirms with Mr. Sims, "It's

13  cool for me to, goddamn it, do like three four," and Mr. Sims

14  replies, "Yeah.  Yeah.  Do as many as you want to do," that

15  would imply to me that -- sir, that Mr. Sims is waiting for

16  Mr. Holiday to provide the money so that Mr. Sims can provide

17  the narcotics.

18  Q.  You wrote, "Sims wanting to get money to be used to

19  purchase illicit narcotics."  I'm trying to figure out how that

20  part of this phone call leads to the conclusion he's trying to

21  obtain money to go buy narcotics?

22  A.  Well, Mr. Sims is not making -- in our summation, is not

23  making the narcotics.  So he would be purchasing the narcotics.

24  So in order for Mr. Sims to purchase narcotics, he would have

25  to have money to purchase that.  So he's getting money from

1  Mr. Holiday or sourcing Mr. Holiday, taking the money from

2  Mr. Holiday, adding it to whatever he's got or starting from

3  fresh -- it at this point doesn't matter -- and then moving

4  forward and purchasing narcotics and giving it back to, almost

5  acting as a go-between, but in this case I believe that he was

6  acting as more of a source.

7  Q.  So it was your expectation at the time of this call that

8  Mr. Sims had no narcotics to sell.

9  A.  I had no expectation of Mr. Sims having or not having

10 narcotics at that time.  He never says, *Hey, I've got to take*

11 *that money and go get more.*

12 Q.  Right.  But that was your conclusion.

13 A.  No.  I -- my conclusion, sir, was that Mr. Sims was waiting

14 to get money.  And he follows that up when he says, "Hell,

15 yeah.  Want, hum, on the 700 hun probably like next week, early

16 next week."  And Mr. Sims replies, "Uh-huh.  Yeah.  Yeah."  So

17 that implies to me that Mr. Sims is waiting for the money in

18 order to source Mr. Holiday.

19 Q.  This call was documented or at least recorded

20 September 25th, 2015.  Correct?

21 A.  Yes, sir.

22 Q.  And the affidavit, is it fair to say, documents two phone

23 calls involving Mr. Sims.  Is that right?

24 A.  Yes, sir.

25 Q.  Okay.  Now, what steps did law enforcement take between

1   September 25th, 2015, and November 2nd, 2015, to investigate

2   Mr. Sims?

3   A.  Give me the dates again, sir.

4   Q.  The date of this last phone call, which was September 25th,

5   2015, and the date that you applied for a wiretap, which was

6   November 2nd, 2015.  I mean, you testified some about the

7   necessity requirement.  Correct?

8   A.  Correct.

9   Q.  And all I'm trying to do now is determine what the agents

10  did to investigate Mr. Sims before they sought court permission

11  to tap his phone.

12  A.  So with all of our targets, we go through a series of

13  checks, if you will, to determine what -- what procedures can

14  be taken in order to fully develop the goals of the

15  investigation, which is ultimately to identify and to bring to

16  prosecution the true source, which is normally located outside

17  of the country.  And in this particular case we discussed and

18  were able to use undercovers and CSs previous to Mr. Sims but

19  not with Mr. Sims.  We had --

20  Q.  And why is that?

21  A.  We had no one that had access to him.  The only access that

22  we had to him was through target telephones previous.

23  Q.  Okay.  You testified that *We had no access to a*

24  *confidential informant or a controlled source who had access to*

25  *Mr. Sims.*

1   A.   Correct.

2   Q.   And does that include you as well as state-level law

3   enforcement?

4   A.   I can't tell you if there was somebody out there that we

5   didn't know of; but as far as we knew, no, sir, there was no --

6   there was no CS or UC that was able to fully give us the

7   breadth of the organization and the steps that that

8   organization was taking to fulfill its obligations.

9   Q.   And how did you know that?  Did you contact local state

10  officials?

11  A.   Yes, sir.  We worked in conjunction with the local

12  Mississippi Bureau of Narcotics.

13  Q.   Specifically about any informants that may have knowledge

14  of Mr. Sims.

15  A.   Through the course of the investigation, we were -- we

16  did -- we did speak with several agents as it relates to

17  confidential sources with multiple targets, to include

18  Mr. Sims.

19  Q.   As you put in this affidavit, you are aware that Mr. Sims

20  has prior drug conviction.  Correct?

21  A.   Yes, sir.

22  Q.   Okay.  Did you make any attempt to reach out to any

23  individual who you think may have been involved in Mr. Sims'

24  past to see if they would be willing to provide information

25  about him?

1    A.   No, sir.   To do that would be basically to tip our hand to

2    that individual, which that individual could easily go back to

3    Mr. Sims and thwart the entire investigation.

4    Q.   You had been using confidential sources with other targets

5    of the investigation.   Correct?

6    A.   We initially used a confidential source at the beginning.

7    Yes, sir.

8    Q.   And more than one.   Am I right?

9    A.   I think there were a couple, yes, sir.

10   Q.   On page 55 of your affidavit, paragraph 47, you inform the

11   court that the initial use of undercover agents has been

12   beneficial in the investigation.   Do you see where I'm reading

13   from?

14   A.   Yes, sir, I do.

15   Q.   Nonetheless, you conclude in this paragraph that it's just

16   not possible to introduce an undercover agent to Mr. Sims.

17   Right?

18   A.   Paraphrasing, yes, sir.

19   Q.   Okay.   You're correct.   I'm paraphrasing.   What attempts

20   did you or any other agent in connection with this

21   investigation make to involve an undercover officer with

22   Mr. Sims?

23   A.   Other than weighing our options?

24   Q.   Yes, sir.

25   A.   I don't think that there was much outside.   There was no

1  one that we knew of that could directly involve themselves with

2  Mr. Sims, again, that would accomplish the goals of the

3  investigation, which is to determine who Mr. Sims' source was.

4  Q.  You would agree that the district court relies on the

5  information in your affidavit to determine whether or not it's

6  going to issue a wiretap.  Is that fair to say?

7  A.  I would assume that it relies pretty heavily on my

8  application, yes, sir.

9  Q.  And in your application -- and you just testified to this a

10  few moments ago -- you talk about Mr. Sims' criminal history,

11  you reference some toll records showing his communication with

12  other targets of the investigation, and then you also

13  transcribed two specific phone calls that you had intercepted.

14  Correct?

15  A.  Correct.

16  Q.  Is there anything in this affidavit that documents, other

17  than your assumptions and considerations, the inability to use

18  undercover agents specifically with Mr. Sims, something about

19  Mr. Sims that makes it impossible or difficult or problematic

20  to use an undercover agent?

21  A.  As the section starts, sir, it basically, you know, talks

22  about how it -- the use of an undercover agent will not be

23  effective in achieving the overall goals of the investigation.

24  So even if -- even if we had an undercover that would have been

25  able to approach Mr. Sims and been able to gain his -- his

1   confidence, Mr. Sims likely would not have just all of a sudden

2   taken in this new person and shown him the inner workings of

3   his organization, which would have defeated the point of having

4   an undercover into Mr. Sims in the first place.

5       It, in fact, would have probably done the opposite.  With a

6   new individual all of a sudden showing up trying to talk to

7   Mr. Sims about his inner workings would have likely led

8   Mr. Sims to change up what he was -- what he was currently

9   doing in order to thwart an investigation.

10  Q.  Now, what you just said, would that not be common in any

11  drug investigation of this nature?

12  A.  I think it depends on the level of the organization; but,

13  yes, it would -- it would apply to those larger quantities of

14  narcotics.

15  Q.  All right.  Let me ask you to turn your attention to page

16  58 of your affidavit.  In the center there there's a sentence,

17  "If Sims was arrested at this time, Sims will likely invoke the

18  Fifth Amendment privilege against self-incrimination and no

19  additional information will be learned."  What was your basis

20  for making that statement?

21  A.  Basically, the assumption that if I were to approach a

22  target with an arrest warrant or even for questioning, that

23  they would not give me the information that I need in order to

24  further the investigation, such as determining their source,

25  their source's source and so on until we reach the origin of

 1  the narcotics.

 2  Q.  Let me ask you to turn to page 67 of your affidavit,

 3  paragraph 68 relating to grand jury investigations.  There's a

 4  sentence that you wrote, "I believe the targets would most

 5  probably invoke their Fifth Amendment testimonial privilege

 6  and, even under a grant of immunity, accept contempt charges

 7  rather than testify against their coconspirators."  What

 8  information did you have at this point to lead you to that

 9  conclusion?

10  A.  At this point we knew that through our investigation that

11  we had been looking at two street-level gangs that had national

12  affiliations, which obviously carries a title of loyalty

13  amongst the coconspirators.  So it would be easy to assume

14  there that they would -- they would absolutely, as you would

15  say, take the fall rather than, you know, spread -- give

16  information on one of their, you know, quote, brothers.

17  Q.  There was no attempt to actually give immunity to any of

18  the other coconspirators in this case, was there?

19  A.  No, sir.  There was no attempt to give anyone immunity.

20  Q.  You also testified that after you submitted the application

21  and your affidavit that the court did enter an order

22  authorizing the wiretap.  And I believe that was marked and

23  admitted as Exhibit Number 3.  Do you have that in front of

24  you?

25  A.  I do not.

1          MR. PATE:  May I approach, Your Honor, and grab the

2     exhibit?

3          THE COURT:  Yes, sir.

4        (DOCUMENT TENDERED TO COUNSEL)

5          MR. PATE:  May I approach the witness?

6          THE COURT:  You may.

7     BY MR. PATE:

8     Q.  I'm handing you a document marked and admitted as

9     Government's Exhibit Number 3.  Do you recognize that as the

10    order that the court entered?

11    A.  Yes, sir.

12    Q.  Now, I believe you testified that you personally took the

13    application and your affidavit to see the district judge.  Is

14    that correct?

15    A.  I personally took it accompanied with AUSA Rushing.

16    Q.  Okay.  Any other agents assist you with that process?

17    A.  That were there at the time of signing?

18    Q.  Yes, sir.

19    A.  I don't recall.

20    Q.  Were there any other agents who submitted affidavits in

21    support of that particular wiretap application?

22    A.  An affidavit in support of this wiretap?

23    Q.  Yes.

24    A.  Not that I'm aware of.

25    Q.  Can I call your attention to page 4 of Exhibit 3, paragraph

1  F?

2  A.  Yes, sir.

3  Q.  Who is Special Agent Jeremiah Rayner?

4  A.  Special Agent Rayner is co-case on this particular case.

5  Q.  Did he provide an affidavit to the court in connection with

6  this application?

7  A.  I don't believe so, sir.

8  Q.  You would agree with me, though, that this order

9  incorporates by reference an attached affidavit of Special

10  Agent Jeremiah Rayner.

11      (WITNESS EXAMINED DOCUMENT)

12  Q.  I mean, that's what it says.  Correct?

13  A.  Can I have one second?

14  Q.  Sure.

15  A.  Thank you.

16      (WITNESS EXAMINED DOCUMENT)

17  A.  In the paragraph that you're referring to, that is Special

18  Agent Rayner's name.  Yes, sir.

19  Q.  Okay.  And just to be clear, as far as you know, he did not

20  submit some other affidavit to the court, did he?

21  A.  No, sir.

22  Q.  And when you actually prepared the application, the only

23  affidavit attached was your affidavit, which we've marked and

24  admitted as Exhibit 2, is that correct, as far as you know?

25  A.  Well, I don't do the order and the application.  My -- I do

1    the affidavit.

2    Q.  Okay.

3    A.  So I'm not -- I'm not sure what is -- is attached.

4    Q.  I believe you testified, though, that you personally

5    submitted that to the district court.  Is that correct?

6    A.  I was there at the same time that the orders and the

7    applications and the affidavit is signed, yes, sir.

8    Q.  Okay.  And just to be clear, you don't recall any other

9    affidavit as part of that submission to the district court

10   other than the one we discussed as Exhibit 2.

11   A.  No, sir.

12   Q.  Okay.  Let me ask you now about the sealing order.  I

13   believe that was also marked and admitted as Exhibit 4(b).  Do

14   you have a copy of that in front of you?

15   A.  I do not, sir.

16          MR. PATE:  Your Honor, may I approach again?

17          THE COURT:  Yes, sir.

18   BY MR. PATE:

19   Q.  Agent Huhn, I'm going to give you a document marked and

20   admitted as Government's Exhibit 4(b).  Is that the application

21   for a sealing order relating specifically to target telephone

22   16?

23   A.  I don't believe this is an application, sir.  It's the

24   actual order.

25   Q.  I'm sorry?

1   A.   It's not an application.   It's the actual order.

2   Q.   It's the actual order.   Okay.

3   A.   Yes, sir.

4   Q.   And the interception that was authorized in this

5   application that led to that order for target telephone 16,

6   when did that authorization expire?

7   A.   Are you -- when did the wire expire?   Is that what you're

8   asking?

9   Q.   Well, the authorization expire.   When did it expire?

10  A.   It ended December 1st at 11:59 p.m.

11  Q.   And is that when agents stopped intercepting calls for

12  target telephone 16 pursuant to this order?   You didn't go

13  beyond that date, did you?

14  A.   No, sir.

15  Q.   Did you stop before that date?

16  A.   I don't recall.

17  Q.   You testified I believe -- and the technology that I'm

18  asking about I may be somewhat confused on.   But you're

19  listening to these phone calls or at least monitoring these

20  phone calls or some agent is in Jackson, Mississippi.   Correct?

21  A.   Correct.

22  Q.   However, the actual digital recordings, the originals, are

23  being maintained in New Orleans.   Is that correct?

24  A.   Correct.

25  Q.   Okay.   And at the time the order expires or you cease

```
1   interception for this target telephone, the actual original
2   tapes, if you will -- and I know they're not -- they're not
3   tapes now, are they?
4   A.  No, sir.
5   Q.  Those actual recordings are maintained in New Orleans.
6   Correct?
7   A.  When you say "maintained in New Orleans," so from the time
8   of activation to deactivation, yes, they would be in
9   New Orleans.  Yes, sir.
10  Q.  Yes.  And you testified that they were put on a Blu-Ray
11  Disc.  Is that right?
12  A.  Yes, sir.
13  Q.  Was that done in New Orleans?
14  A.  Yes, sir.
15  Q.  And then that disc was put into an evidence bag.  Right?
16  A.  Correct.
17  Q.  Who put the disc into the evidence bag?
18  A.  That would be the technician, Steve Nelson.
19  Q.  And then that evidence bag was transported to this
20  district.
21  A.  Correct.
22  Q.  How was it transported?
23  A.  Through FedEx.
24  Q.  FedEx?
25  A.  Yes, sir.
```

1   Q.   And who with FedEx transported the disc?

2   A.   I would assume a delivery driver.

3   Q.   Is there any documentation as to who that person is?

4   A.   As to who delivered the FedEx?

5   Q.   Yes.

6   A.   No, sir.

7   Q.   And you don't know -- and I'm certainly not trying to test

8   your knowledge of this.  You don't know what FedEx did with it

9   from the time they picked it up in New Orleans until the time

10  they delivered it to your office here in Jackson.

11  A.   Correct.

12  Q.   I mean, they may very well have had some transportation to

13  another district, kind of a waylay point, and then taken it on

14  another aircraft.  I mean, you just don't know, do you?

15  A.   Correct.

16  Q.   And you had testified that it was sealed up during that

17  period of time.  You meant it was in the evidence bag.  Right?

18  A.   Correct.

19  Q.   I mean, there was no court order sealing those tapes as

20  they were transported from New Orleans to Jackson.  Right?

21  A.   No, sir.

22  Q.   And how long did it take those recordings to make their way

23  from New Orleans to your office in Jackson?

24  A.   I don't know the specific time other than they were

25  overnighted to us.

1    Q.  Do you know the specific time they were given to FedEx?

2    A.  Do I know the specific?  I do not.

3    Q.  Is that documented anywhere in your files?

4    A.  Not that I'm aware of.

5         THE COURT:  How many separate recordings were there

6    during the time of the wiretap?

7         THE WITNESS:  So New Orleans, they will give us a

8    master disc which actually has the calls on it.  And then they

9    give us a working disc which is an exact copy.  But that's the

10   disc that we're able to work off of after the fact.  The

11   original disc is placed in a heat-sealed evidence envelope.

12        THE COURT:  There's only one disc for the entire --

13        THE WITNESS:  Yes, sir.  Yes, sir, the entire --

14        THE COURT:  -- period of the tap, which might cover

15   several calls.

16        THE WITNESS:  Correct, sir.  All of the sessions are

17   placed on to one Blu-Ray Disc.

18   BY MR. PATE:

19   Q.  And you testified about some e-mail exchanges between you

20   and Mr. Rushing.  Is that correct?  Do you recall that?

21   A.  Yes, sir.

22   Q.  Did you initiate those e-mails once you received the disc

23   from New Orleans?

24   A.  Did I initiate the e-mails?

25   Q.  Yes, sir, or did Mr. Rushing?  And I don't have the e-mails

1    in front of me.

2    A.  I know that Mr. Rushing initiated an e-mail on that

3    following Monday.  I don't know if we spoke by phone previous

4    or not.

5          MR. PATE:  Your Honor, may I approach to get that

6    exhibit?

7          THE COURT:  Yes, sir.

8          MR. PATE:  Thank you, sir.

9    BY MR. PATE:

10   Q.  Yes, sir.  And I can certainly show this to you, but I

11   believe -- and see if this refreshes your recollection -- that

12   Mr. Rushing reached out to you on December 7th asking about the

13   status of the recordings for target telephones 15 and 16.  Does

14   that sound about accurate?

15   A.  Yes, sir.

16   Q.  And specifically referenced that "We need to have the disc

17   sealed."  Do you recall that?

18   A.  Yes, sir.

19   Q.  Now, this is on December 7.  So this would have been six

20   days after the authorization had expired on December 1st.

21   Correct?

22   A.  If it expired December the 1st at 11:59 p.m. -- I'm not

23   sure if you're including December the 1st in there, but you

24   would have the 2nd, the 3rd and then the 4th and 5th and 6th.

25   Q.  Okay.  And I believe you testified earlier you believe or

```
 1   have recorded somewhere you received them in your office on the
 2   3rd.  Is that your recollection?
 3   A.  Yes, sir.  They were overnighted to us on December the 2nd.
 4   We received them on the 3rd.
 5   Q.  And what steps did you take before Mr. Rushing reached out
 6   to you to have those recordings sealed?
 7   A.  I don't recall if we contacted Mr. Rushing by phone or not.
 8   We do not have e-mails, but I don't know if we contacted by
 9   phone or not.
10   Q.  Are you familiar with Title III's requirement about sealing
11   recordings in a situation like this?
12   A.  In a situation like this?  What do you mean, sir?
13   Q.  When there's a wiretap.
14   A.  Sure.
15   Q.  Okay.  And what is your understanding of when those
16   recordings must be sealed?
17   A.  As soon as possible.
18   Q.  As soon as possible?  Are you aware that the statute says
19   immediately?
20   A.  Okay.  Immediately, sir.
21   Q.  I mean, is that your understanding of it?
22   A.  I'd have to look at the statute again.
23   Q.  Okay.  But sitting here today you think it's as soon as
24   possible.
25   A.  It would be immediately, as you say, as -- I mean, as soon
```

1    as humanly possible, yes, sir.

2    Q.  Okay.  Do you know what, if anything, happened with the

3    recordings between December 3rd and December 7th?

4    A.  Do I know what, if anything?

5    Q.  Do you know if anything happened to those recordings?

6    A.  I know that when we received the recording, that we

7    received the disc on November the 3rd *(sic)*, it was placed into

8    a nondrug evidence locker and that nondrug evidence locker has

9    one key.  And it is inside of a locked room which is inside of

10   three keypad locked codes that you have to have a certain level

11   of security clearance that only the agents have.  The office

12   personnel does not have that.

13       You have to have -- to come into the building to where

14   they're kept, you go through scanners.  And everyone's checked

15   there.  So it's basically inside of a -- you know, a secured

16   building behind three key-coded doors and a lock.

17   Q.  Mr. Rushing I believe responded to you on the same day,

18   Monday, December 7, saying, "Thanks," related to going ahead.

19   And you said you're available all week to go to the judge.  Do

20   you see that?

21   A.  On?

22   Q.  On the 7th.

23   A.  Yes.

24   Q.  Okay.  And when did you next hear from anyone representing

25   the government about sealing these recordings?

1    A.  That would be Thursday, December the 10th.

2    Q.  And what prompted that message?  Do you recall, or can you

3    see from the e-mail communications?

4    A.  I had communicated with Mr. Rushing.

5    Q.  Anything about sealing target telephone 16 during that

6    e-mail that you sent to Mr. Rushing on December 8th?

7    A.  On -- no, sir.

8    Q.  And the actual process of sealing a recording, that doesn't

9    take a long time to do once you have the district court

10   available to do it.  Correct?

11   A.  Correct.

12   Q.  Not something that should take several hours, is it?

13   A.  It shouldn't.

14   Q.  It should?

15   A.  It shouldn't.

16   Q.  Okay.  Are you personally aware of what Mr. Rushing was

17   doing between December 7 and December 10?  Are you personally

18   aware of what he was doing or why he was unavailable?

19   A.  No, sir.

20   Q.  Did you make any attempt to contact anyone else in the

21   United States Attorney's Office from December 7 to December 10

22   regarding these -- this target telephone 16 recordings to get

23   them sealed?

24   A.  No, sir.

25   Q.  Did anyone from that office reach out to you in reference

1  to that?

2  A.  I don't recall.

3  Q.  You had testified some about your understanding of

4  minimization of phone calls when you're on a wiretap, when

5  you're listening in pursuant to the court's authority to

6  telephone communications.  Do you recall that testimony about

7  minimization?

8  A.  Yes, sir.

9  Q.  Okay.  And I believe you testified specifically to either

10 discussions you've had with prosecutors, written material

11 that's been provided to you.  It's fair to say you understand

12 what you're supposed to do in terms of minimizing your

13 interception or listening to calls that are not pertinent to

14 the investigation.

15 A.  Okay.  Yes, sir.

16 Q.  I mean, it's not new.  It's not a new concept to you, is

17 it?

18 A.  No, sir.

19 Q.  During the time of the first order relating to target

20 telephone 16, did you attempt to document how many calls were

21 minimized pursuant to the court's instructions?

22 A.  Did I document on the first order how many were minimized?

23 Q.  Yes, sir.

24 A.  On the --

25 Q.  And maybe the question's --

1  A.  In order -- like I said, in order to minimize I would have

2  to have an order to have an active T III.

3  Q.  Right.

4  A.  So the order comes before the actual T III authorization.

5  I'm not sure -- maybe I'm not following you.

6  Q.  Poor question.  For this particular target telephone 16 --

7          THE COURT:  Would you get back on the mic?

8          MR. PATE:  Yes, sir.  I'm sorry.

9  BY MR. PATE:

10 Q.  For this particular target telephone 16, during the time

11 that you're listening to the calls after the court has entered

12 the order -- November 2015 you guys are monitoring telephone

13 calls.  Correct?

14 A.  Correct.

15 Q.  And is it common during that process as you're documenting

16 call sessions to indicate where calls have been minimized

17 pursuant to the court's instructions?

18 A.  There is documentation that calls are minimized.  If that's

19 what you're asking, yes.

20 Q.  It is what I'm asking.

21 A.  Yes.

22 Q.  And the general question -- and you may not know sitting

23 there today -- did you attempt to document and put a number on

24 how many calls for that particular target telephone were

25 minimized during that time?

A.  I don't -- did I attempt to?

Q.  Yes.

A.  There is a log.  It's an electronic log, basically, a computer program, which keeps a running tally.  So --

Q.  Right.

A.  -- it's not like the old days where, you know, reel-to-reel and you hear something that's non-pertinent and you hit the pause button that you document.  It's a computer program that's --

Q.  Right.

A.  It's a computer-based data sheet, basically.  So --

Q.  It's easy to tell when a call has been minimized from that documentation.

A.  Yes.

Q.  And you were aware before coming today to testify that the issue of minimization was something we had raised in our motion.  Correct?

A.  Correct.

Q.  Did you attempt to determine how many calls you guys minimized during the existence of this wiretap?

A.  We did.

Q.  Okay.  How many?

A.  I do not know the number.

          THE COURT:  Let me -- fill me in.  I'm not familiar with the workings.  Somebody's sitting and monitoring the tap

1   so that you can hear when the phone rings from or to this

2   tapped phone.  And some non-pertinent telephone call comes in.

3   And I assume "minimizes" means to cut that out, stop listening

4   to that call once you are confident that it is not pertinent to

5   the investigation.  Is that what "minimize" means, essentially?

6           THE WITNESS:  Yes, sir.  So when that happens, the

7   monitor -- actually, it's -- it's like I said, not in the old

8   days.  You don't have a pause button on a reel-to-reel anymore.

9   It's just a click of the mouse.  It pauses the recording.  So

10  the conversation is still happening.  It's muted so the monitor

11  and no one else can hear it.  It's also not recorded on the

12  main disc.  So that conversation is not recorded and not

13  listened to.

14          THE COURT:  And there's no way to go back and --

15          THE WITNESS:  No, sir.

16          THE COURT:  -- re-gather that --

17          THE WITNESS:  No, sir.

18          THE COURT:  -- call.  All right.  Thank you.

19          THE WITNESS:  Yes, sir.

20  BY MR. PATE:

21  Q.  But, agent, can you tell from that computer program how

22  many calls were minimized?

23  A.  Yes.

24  Q.  Okay.  You were asked specifically about one phone call

25  that occurred.  I believe the session was 2345.  It's

1  documented in Government's Exhibit 6, which is the affidavit in

2  support of the second wiretap on target telephone 16, the first

3  one on target telephone 17.  I know that was not your personal

4  affidavit, but do you have that document in front of you?

5  A.  I do.

6  Q.  Okay.  Can I ask you to turn to page 38, paragraph 41,

7  which does reference that call?

8  A.  You said page 41?

9  Q.  38.

10  A.  38.

11  Q.  Paragraph 41.

12      (WITNESS EXAMINED DOCUMENT)

13  A.  Okay, sir.

14  Q.  Okay.  And you had testified that this phone call between

15  you believe Mr. Sims and Herrin-Gear Lexus was not minimized.

16  That's correct.  Right?

17  A.  Correct.

18  Q.  And you said it was not minimized because it related to the

19  financial side of your investigation.  Was that your testimony?

20  A.  That was one side of it.  Yes, sir.

21  Q.  You also said it would assist in asset forfeiture.  Is that

22  correct?

23  A.  Possibly.

24  Q.  And what is your understanding about the ability to use a

25  wiretap to assist with asset forfeiture?

1  A.  I don't necessarily know that it directly is used for asset

2  forfeiture.

3  Q.  And as far as the financial side of your investigation,

4  have you reviewed the content of this phone call recently?

5  A.  Yes, sir.

6  Q.  And is it fair to say that the very first thing that's

7  attributed to Mr. Sims is he's trying to speak to a service

8  consultant?

9  A.  Yes, sir.

10  Q.  "I had got this car from."  Do you see that?

11  A.  Correct.

12  Q.  Is there anything in this phone call that references him

13  spending money that you have been able to attribute to some

14  unlawful source?

15  A.  I can't speculate to source of the funds.

16  Q.  You did testify that when a phone call in an investigation

17  like this relates to money, that you're necessarily going to

18  listen in to that call.  Is that a decent summary of what you

19  just said?

20  A.  Can you restate that for me?

21  Q.  Yeah.  Well, why don't you restate it for me?  I don't want

22  to put words in your mouth.  If you're intercepting phone calls

23  on my telephone and I call Walmart to order a sofa, is that

24  pertinent to an investigation like this where you're looking at

25  possible narcotic transactions?

1  A.  I'm not sure if you're under investigation for money

2  laundering or exactly why you're under investigation, sir.

3  Q.  If it is money laundering, does any phone call that relates

4  to an asset purchase of any kind not need to be minimized?  Is

5  it necessarily pertinent because it involves spending money?

6  A.  I think it would go to the amount kind of an issue.  If the

7  target is purchasing a property or a -- in this case a vehicle

8  versus, you know, purchasing a pizza, I think that there's a

9  difference.

10 Q.  But is this call relating to the purchase of a vehicle or

11 the past purchase of a vehicle?

12 A.  It is directly related to the past purchase of the vehicle.

13 Q.  And how is that pertinent to your ongoing investigation for

14 illegal narcotics transactions?

15 A.  Well, Mr. Sims had apparently purchased a vehicle at which

16 we were able to determine which would, there again, show that

17 Mr. Sims has enough money that he can go out and purchase

18 vehicles in the financial investigative side of this thing that

19 says, *Well, what's his income-to-expenditure ratio?*

20 Q.  Okay.  And at the time you're monitoring this call what did

21 you know about Mr. Sim's income from legitimate sources?

22 A.  We knew that Mr. Sims did not have a legitimate job.

23 Q.  Were there other phone calls relating to asset purchases

24 that you picked up but were either minimized or considered not

25 pertinent relating to Mr. Sims specifically?

1   A.  I don't recall.

2           MR. PATE:  If I may approach the clerk to give this

3   back.

4           THE COURT:  You may.

5           MR. PATE:  That's all I have, Your Honor.  Thank you.

6           THE COURT:  All right.  Direct.

7                         **REDIRECT EXAMINATION**

8   BY MR. RUSHING:

9   Q.  Mr. Huhn, I want to go back on paragraph 59 I believe of

10  the affidavit you have in front of you.

11  A.  Yes, sir.

12  Q.  And on that one does that deal with actually conducting

13  surveillance on Mr. Sims also or not?

14  A.  Hang on for me one second.

15      (WITNESS EXAMINED DOCUMENT)

16  A.  Paragraph 59?

17  Q.  Yes, sir.  It talks about the -- a neighbor who questioned

18  utilizes light poles which are not extended to most areas?

19  A.  Correct.  So in the course of our investigations we're able

20  to utilize covert devices in order to surveil targets.  In this

21  case this paragraph references the inability to -- or at least

22  the difficulty to conceal such a device in the area of

23  Mr. Sims' residence.

24  Q.  And after that address was actually discovered, did y'all

25  conduct surveillance in that area?

1   A.  We did, sir.

2   Q.  And how long, sir?

3   A.  I don't know exactly the amount of time that we surveilled

4   Mr. Sims.

5   Q.  There was talk about the recordings, the actual Blu-Ray

6   Discs I guess.  The actual recording of the Title III wiretap,

7   is that conducted on tapes or some other type of medium, if you

8   know?

9   A.  To my understanding, it's electronically -- in an

10  electronic format stored on a hard drive computer, and from

11  there it's placed on to a Blu-Ray Disc.

12  Q.  So it's not -- in the traditional sense in the old days,

13  you used to have an actual tape that would actually roll and

14  record everything.  Right?

15  A.  Yes, sir.

16  Q.  And this does not involve any type of tapes at all, does

17  it?

18  A.  No, sir.

19  Q.  It's electronic impulses on a computer system?

20  A.  Correct.

21          MR. RUSHING:  That's all I have, Your Honor.

22          THE COURT:  All right.  You may step down.  Is the

23  government going to have another witness?

24          MR. RUSHING:  Yes, Your Honor.  Call Richard White,

25  Your Honor.

```
 1              THE COURT:  Let's take a little break before we start.

 2              MR. RUSHING:  Yes, sir.

 3              THE COURT:  Are we going to be able to finish this

 4   afternoon?

 5              MR. RUSHING:  We should, Your Honor.

 6              THE COURT:  Including arguments?

 7              MR. PATE:  I believe so, Your Honor.

 8              MR. RUSHING:  I think so.

 9              THE COURT:  All right.  Let's take about a 20-minute

10   break, until 20 after three.

11       (RECESS)

12              THE COURT:  Mr. Rushing.

13              MR. RUSHING:  Call Richard Wright, Your Honor.

14       (WITNESS WAS ADMINISTERED THE OATH)

15              MR. RUSHING:  Please the court.

16              THE COURT:  Yes, sir.

17                          RICHARD WRIGHT,

18   having first been duly sworn, testified as follows:

19                       DIRECT EXAMINATION

20   BY MR. RUSHING:

21   Q.  Will you state your name, please, sir.

22   A.  Richard Wright.

23   Q.  Mr. Wright, where are you employed?

24   A.  I'm an agent with the Mississippi Bureau of Narcotics.

25   Q.  And for how long, sir?
```

```
 1   A.   17 years.
 2   Q.   Were you working in that same capacity whenever the
 3   investigation concerning Allen Sims arose?
 4   A.   Yes, sir.
 5   Q.   And back in September I believe of 2016 did you participate
 6   in drafting an affidavit for a search warrant?
 7   A.   Yes, sir.
 8   Q.   And that was for 1227 Springdale Drive in Jackson.  Is that
 9   correct?
10   A.   Correct.  That's correct.
11            MR. RUSHING:  May I approach the witness, Your Honor?
12            THE COURT:  Yes, sir.
13   BY MR. RUSHING:
14   Q.   I've handed you Exhibit Number 11.  Is that correct?
15   A.   Yes, sir.
16   Q.   And is that a true and correct copy of the search warrant
17   that you obtained for that address back in September of 2016?
18   A.   Yes, sir, it is.
19   Q.   And in that particular search warrant -- let me ask you,
20   could you look at the search warrant and make sure it's a true
21   and correct copy, sir?
22        (WITNESS EXAMINED DOCUMENT)
23   A.   Yes, sir.
24            MR. RUSHING:  Your Honor, the government offers
25   Exhibit Number 11 into evidence at this time for this hearing
```

1    only, of course.

2             MR. PATE:  No objection.

3             THE COURT:  Exhibit 11 will be received into evidence.

4        (EXHIBIT G-11 MARKED)

5    BY MR. RUSHING:

6    Q.  Mr. Wright, in your application for search warrant, I

7    believe you've got information concerning a confidential

8    source.  Is that correct?

9    A.  Yes, sir.

10   Q.  And that confidential source -- what is the confidential

11   source?

12   A.  What is this confidential source?

13   Q.  Yes, sir.

14   A.  Yeah, the Title III, a wiretap.

15   Q.  And in that -- the application and affidavit, I believe

16   you've got actually quotations of what was said by Mr. Sims and

17   other people.  Is that correct?

18   A.  Yes, sir.  That's correct.

19   Q.  And were those direct quotes from the wiretap?

20   A.  Yes, sir.

21   Q.  When you presented that to the judge, what kind of judge

22   was that?

23   A.  It was a Hinds County Circuit Court judge.

24   Q.  Do you remember which judge signed it?

25   A.  Judge William Gowan.

1   Q.   Judge Gowan?

2   A.   Yes, sir.

3   Q.   And when you presented that affidavit to the judge, did he

4   actually -- did you advise him at that time that the

5   confidential source was a wire intercept, or do you recall?

6   A.   I don't recall.

7   Q.   But, in any event, it does contain statements -- purported

8   statements from Mr. Sims and other individuals.  Is that

9   correct?

10  A.   Yes, sir.

11  Q.   Now, in conducting your investigation did you -- from the

12  information you received from the confidential source, or the

13  wire, did you corroborate that?

14  A.   Yes, sir.

15  Q.   And how did you do that, sir?

16  A.   Through surveillance.

17  Q.   And is that set forth in your affidavit for search warrant?

18  A.   Yes, sir, it is.

19  Q.   Most particularly, I think February the 3rd of 2016, I

20  believe you've got some comments concerning Mr. Sims contacting

21  an individual, talks about purchasing some drugs.  Is that

22  correct?

23  A.   Yes, sir.

24  Q.   And in the affidavit does he talk about the -- the

25  confidential source information, or the wire, about where it's

1    to be delivered at?

2    A.  Yes, sir.  Yes, sir.

3    Q.  And based on the information received from the source, what

4    did you do, according to the affidavit?

5    A.  According to the affidavit, we established surveillance on

6    Sims and followed him through that day.

7            THE COURT:  Would you pull that microphone a little

8    closer to your mouth.

9            THE WITNESS:  Yes, sir.

10   BY MR. RUSHING:

11   Q.  And did you actually follow him to the location that's set

12   forth in the affidavit concerning the location where the

13   anticipated drug transaction was to occur?

14   A.  Yes, sir, we did.

15   Q.  And did you find Mr. Sims in that location?

16   A.  Yes, sir.

17   Q.  Did you find anything else in that location?

18   A.  Yes, sir, we did.  We also found another vehicle parked at

19   this residence that on other occasions Sims had been the driver

20   of.

21   Q.  And back in February did you -- while listening to the

22   wire, did you receive a description of the vehicle that had

23   been transporting or delivering alleged drugs?

24   A.  Yes, sir.

25   Q.  And based on that information, what did y'all do?

1    A.  Based on that information, we stopped the vehicle.

2    Q.  Did you find a vehicle fitting that description, first?

3    A.  Yes, sir.

4    Q.  And was a traffic stop committed on that vehicle?

5    A.  Yes, sir.

6    Q.  And who was driving that vehicle, if you recall?

7    A.  You want me to find his name in here?

8    Q.  Yes, sir.

9        (WITNESS EXAMINED DOCUMENT)

10   A.  Daniel Tejada.

11   Q.  Is that T-E-J-A-D-A?

12   A.  Yes, sir.

13   Q.  Okay.

14   A.  And then a passenger, Juan Defrond (phonetic).

15   Q.  Juan Dunfrund.

16   A.  Dunfrund.

17   Q.  So from the actual information you received, did you -- the

18   confidential source, did you actually also conduct surveillance

19   and actually corroborate the information of the confidential

20   source?

21   A.  Yes, sir.

22   Q.  How long was this investigation going on?

23   A.  From -- right from the time it started?

24   Q.  Yes, sir.

25   A.  This -- let's see.  This was 2016.  Probably close to --

1   close to two years.

2   Q.  Now, after February the 3rd whenever y'all stopped the

3   person with the drugs I guess, how much drugs were inside the

4   vehicle?

5   A.  66 pounds.

6   Q.  Of what, sir?

7   A.  Methamphetamine.

8   Q.  And that was February of 2016?

9   A.  Yes, sir, February 3rd of 2016.

10  Q.  During that time period, did you -- did y'all conduct any

11  further investigation as to Mr. Sims?

12  A.  Yes, sir.

13  Q.  And what did you find during your investigation?

14  A.  During the investigation we found that Sims was

15  continuing -- after that stop, continuing the same operation as

16  far as his stash houses and things of that nature.

17  Q.  Did you put that information also in the affidavit you've

18  got there?

19  A.  Yes, sir, we did.

20  Q.  And I think in September of 2016 you -- is when you

21  actually applied for the search warrant for his home.  Is

22  that -- or the residence, rather.  Is that correct?

23  A.  Yes, sir.

24  Q.  And where was that residence located?

25  A.  His residence was located -- the one in the search warrant

1  or his residence?

2  Q.  On the search warrant.

3  A.  The search warrant was 1227 Springdale Drive.

4  Q.  And that was in September.  Is that correct?

5  A.  Yes, sir.

6  Q.  Now, the search warrant you're looking for particular items

7  of -- is that correct?

8  A.  Yes, sir.

9  Q.  And what type of items were you looking for?

10 A.  Records, papers, any ledgers, anything of that nature that

11 would be used to identify records that he was keeping on his

12 narcotics transactions.

13 Q.  And did you set forth in your affidavit the last time that

14 you had seen or were aware that Mr. Sims was in the location of

15 that particular residence also?

16 A.  Yes, sir.  We -- we did surveillance, basically a constant

17 surveillance, through the time that we executed the search

18 warrant and saw him frequent this address many times.

19 Q.  Do you have that in the affidavit the last time that you

20 saw that -- I guess the car at the location or whatever?

21 A.  Yes, sir, as recent as September the 13th.

22 Q.  September 13th, 2016?

23 A.  Yes, sir.  That's correct.

24 Q.  And when did you run your warrant?

25 A.  I believe we ran the -- I believe we ran the warrant --

1    (WITNESS EXAMINED DOCUMENT)

2  A.  I believe we ran it on the day after it, I think maybe the

3  17th.  I can't -- I can't recall.

4  Q.  Were you actually involved in the actual search being

5  conducted of the residence?

6  A.  No, sir.

7          MR. RUSHING:  Tender the witness, Your Honor.

8          MR. PATE:  Please the court.

9          THE COURT:  Yes, sir.

10                    **CROSS-EXAMINATION**

11  BY MR. PATE:

12  Q.  Agent Wright, good afternoon.

13  A.  Good afternoon.

14  Q.  Do you still have Exhibit 11 in front of you there, your

15  affidavit?

16  A.  Yes, sir.

17  Q.  Let me ask you a question before I get into the details of

18  the affidavit.  What was your role in this investigation?  Were

19  you one of the lead agents or were you just helping out?

20  A.  No, sir.  I'm a -- we're a small group.  I'm a task force

21  agent assigned to DEA.  And, really, we all -- when we get into

22  a case like this, we all work whatever part we can to help.

23  So, I mean, as I was not the case agent or a co-case agent, I

24  was, you know, working wire shifts and things of that nature.

25  Different -- different aspects of the investigation I was

1    involved in.

2    Q.  All right.  You were working with Agent Huhn.  Is that

3    correct?

4    A.  Yes, sir.  That's correct.

5    Q.  And another co-case agent?

6    A.  Yes, sir.

7    Q.  Were you reporting to the DEA agents or were y'all kind of

8    just sharing responsibilities?

9    A.  I guess you'd say we were all kind of sharing

10   responsibilities.

11   Q.  Okay.  Are you aware at the time that you prepared this

12   affidavit, Exhibit 11, that there had already been federal

13   court wiretaps authorized in connection with Mr. Sims' case?

14   A.  Yes, sir.

15   Q.  Okay.  Do you have any reason to know or were you told as

16   to why these search warrants were presented or these

17   applications for search warrants were presented to a state

18   court judge instead of a federal judge?

19   A.  No, sir.

20   Q.  Were you specifically directed to present them to the state

21   court judge?

22   A.  We just -- when everything started, we started writing

23   search warrants.  And I wrote a state search warrant on it.  It

24   was -- I wasn't directed to do it.  That's just -- we just

25   started -- started, you know, getting all of our locations in

1  order.

2  Q.  During this time of the investigation, again, I think we're

3  talking September 16, 2016, were you personally in

4  communication with either Mr. Rushing or someone else at the

5  U.S. Attorney's Office?

6  A.  I don't think I was.  There were -- you know, maybe Huhn

7  and a co-case agent would have been communicating with the

8  AUSA.

9  Q.  All right.  And I think you testified this investigation

10 had been ongoing for some two years almost?

11 A.  Yes, sir, roughly.

12 Q.  Okay.  Earlier you testified about the confidential source

13 that you refer to in your affidavit.  And that, in fact, was a

14 wiretap.  Is that right?

15 A.  Yes, sir.  That's correct.

16 Q.  And what is the reason for referring to wiretap information

17 as information obtained from a confidential source?

18 A.  Well, I mean, just -- just a simple fact that -- can you

19 rephrase that?

20 Q.  Yeah.  Why don't you just say *We got it from a wiretap*?

21 A.  We just -- we don't -- we don't disclose it like that.

22 We -- it's a confidential source in the affidavit.  We just

23 don't put "wiretap."  Never have.

24 Q.  Now, it's fair to say that the wiretap that you were

25 referring to had expired many months before you signed this

1    affidavit.

2    A.  Yes, sir.

3    Q.  All right.  So you weren't concerned about divulging the

4    existence of a wiretap.

5    A.  I do not know if the wiretaps were still under seal or not.

6    Q.  From maybe other people?

7    A.  Possibly.

8    Q.  But you don't recall, at least your testimony today, you or

9    anyone else ever informing the state court judge that the

10   confidential source was an actual wiretap?

11   A.  No, sir, I don't remember.

12   Q.  Authorized by a federal judge.

13   A.  I don't remember.  Yes, sir.

14   Q.  And in the affidavit -- and I'm going to refer you

15   specifically to page 9, I believe paragraph C.  I'll give you a

16   second to get there.

17       (WITNESS EXAMINED DOCUMENT)

18   A.  Yes, sir.

19   Q.  You refer to a phone call -- well, no, you don't.  You say,

20   "According to a reliable CS on February 1, 2016, Sims received

21   a telephone call from a Mexico-based number."  Do you see that?

22   A.  Yes, sir.

23   Q.  Okay.  And, again, that reliable CS was the -- the wiretap

24   that was in place at the time.

25   A.  Yes, sir.

1    Q.  You did not reference any calls either with Sims or

2    relating to Sims prior to February 1 in this affidavit, did

3    you?

4    A.  No, sir.

5    Q.  Then if you'll flip over to page 10, you reference some

6    surveillance that you or other agents conducted on

7    February 3rd, just two days after that call.  Is that correct?

8    A.  Yes, sir.

9    Q.  All right.  And there are several pages relating to that

10   surveillance in your affidavit.  Is that correct?

11   A.  Yes, sir.

12   Q.  And I believe one additional call on February 3rd is

13   referred to in paragraph H on page 11.  Is that correct?

14   A.  You said paragraph --

15   Q.  I think it's H?

16   A.  H?

17   Q.  As in happy.

18   A.  Yes, sir.

19   Q.  Okay.  So is it fair to say in your affidavit you refer to

20   two phone calls in February of 2016 and some surveillance in

21   February 2016, and that's the sum total of what you base this

22   affidavit on as far as probable cause relating to the search of

23   this particular location?

24   A.  Yes, sir.

25   Q.  There weren't any other phone calls or other information

1  presented to the state court judge that are outside of the four

2  corners of this affidavit.  In other words, nobody sat there

3  and gave him oral testimony.

4  A.  No, sir.

5  Q.  Now, you did testify that this investigation continued

6  beyond February of 2016.  Right?  I mean, y'all hadn't been

7  shut down on February 3rd, 2016.

8  A.  Oh, no, sir.

9  Q.  In fact, it took seven months -- or a little more than

10  seven months for you to prepare and submit this affidavit in

11  support of the search warrant for this residence?

12  A.  Yes, sir.

13  Q.  And your testimony was you were continuing the

14  investigation during that time.  Is that right?

15  A.  Yes, sir.

16  Q.  How was the investigation continuing so far as it related

17  to Mr. Sims?

18  A.  Well, basically, Sims being connected to the other people

19  in the case, we -- are you talking about on this actual

20  address?

21  Q.  Yeah.  What were y'all doing in relation to Mr. Sims from

22  February 2016 to September 2016?

23  A.  I mean, we continued surveillance on this residence through

24  electronic means.  We had a camera on this residence.

25  Q.  You had a pole camera.

1    A.  Yes, sir.

2    Q.  And what was referenced -- or what was seen on the pole

3    camera that gave further evidence that Mr. Sims was involved in

4    illegal drug trafficking?

5    A.  Just after the -- or during this time of surveillance, he

6    was maintaining the same pattern that he did during the

7    September, him coming -- coming and going from the residence

8    along with other known narcotics dealers in Jackson, in and out

9    of that residence.

10   Q.  All right.  You said continuing the same operation.  Right?

11   A.  Same pattern, yes, sir, of coming and going from the

12   residence.  Yes, sir.

13   Q.  Okay.  There's no specific either transaction, visit or

14   activity of Mr. Sims documented in this affidavit from February

15   the 3rd, 2016, until the date -- well, until the date you

16   signed it September 16th.

17   A.  No, sir.

18   Q.  You said you had him under constant surveillance.  I assume

19   that was the pole camera you were referring to.  Right?

20   A.  Yes, sir.

21   Q.  Was any information derived from the use of that pole

22   camera that was specifically communicated to the state court

23   judge?

24   A.  No, sir.

25   Q.  Was there any attempt -- or did y'all obtain any phone

1   calls between Mr. Sims and someone else connected to this

2   investigation during that seven-month period?

3   A.  No, sir.

4   Q.  Was there any surveillance of Mr. Sims other than around

5   his residences meeting with coconspirators during that

6   seven-month period?

7   A.  Not that I recall.

8   Q.  And it's fair to say on February the 3rd, 2016, I mean, you

9   document through your surveillance a significant amount of

10  activity culminating in the seizure of 66 pounds of

11  methamphetamine.  Right?

12  A.  Yes, sir.

13  Q.  Did you believe at that point back in February 2016 you had

14  enough information to go get a warrant for his house?

15  A.  Yes, sir.

16  Q.  Why didn't you?

17  A.  Like I said, just continuing the investigation through --

18  through other means, other people.  It doesn't stop with him.

19  Q.  Sure.  No.  Was the reason -- tell me if I'm right or

20  wrong -- communicated to you that a search warrant at that

21  point may jeopardize other subjects of the investigation?

22  A.  Yes, sir.

23  Q.  So it really wasn't that you were trying to gain more

24  information about Mr. Sims during that seven-month period.

25  A.  We were trying to further the investigation.

1  Q.  Relating to other individuals.

2  A.  The whole organization, whole drug-trafficking

3  organization.

4  Q.  What did you get about Sims that would add to your basis

5  for searching his residence during that seven-month period?

6  A.  Just what's in the affidavit.

7  Q.  Let me focus on that.  It's page 12, paragraph J.  "Since

8  February 3rd, 2016, agents have been able to maintain

9  surveillance on Sims' stash house located at 1227 Springdale

10  Drive and at Sims' residence located at 109 Stillhouse Creek

11  Drive."  Do you see where that is?

12  A.  Yes, sir.

13  Q.  "Where agents have observed Sims and his silver Lexus as

14  recent as September 13, 2016."  Is that what you put in this

15  affidavit?

16  A.  Yes, sir.

17  Q.  And I skipped some zip codes and things like that.

18  A.  Right.  Yes, sir.

19  Q.  Well, where was he on September 13th?  Was he at the

20  Springdale address or was he at the Stillhouse address?

21  A.  This right here is, I mean, basically saying up and to --

22  as recently as September 13, we had seen Sims coming and going

23  from the 1227 Springdale address.

24  Q.  I'm just -- just reading that, does it not appear to you

25  that the September 13 date's referring to the Stillhouse Creek

1  address?  That's the one that precedes it.

2  A.  I believe it -- I mean and at Sims' residence.  It's

3  reference to both.  That's why both addresses are in that one

4  paragraph.

5  Q.  So you're saying here he was at both of those addresses on

6  September 13 --

7  A.  He was seen coming and going, but he was seen as recent as

8  September 13th.  We're not -- I don't believe that I'm saying

9  on this -- on September 13th he went to 1227 and he went to

10  Stillhouse Creek.  Stillhouse Creek was his place of residence.

11  Q.  Right.  Right.

12  A.  So he was seen as late as 2000- -- September 13th, 2016,

13  coming and going from the Springdale address.

14  Q.  So it's your testimony today that there would be pole

15  camera footage to corroborate that Mr. Sims was at the

16  Springdale Drive address on September 13, 2016.

17  A.  I can't -- I mean, I hadn't looked at the video in -- in --

18  I mean, since this went down.

19  Q.  Sure.  And I'm just trying to find the basis of you saying

20  that he was at these two addresses on that date.  And I

21  understand your testimony.  But do you recall today how you

22  came to that conclusion?  Did you see him there?  Was it --

23  A.  No, sir, I can't recall.

24  Q.  And as you sit here today, do you recall what Mr. Sims was

25  doing at one or more of these residences on September 13, 2016?

```
 1   A.  I mean, as far as specifically?

 2   Q.  Yes, sir.

 3   A.  No, sir.

 4         MR. PATE:  That's all I have, Your Honor.

 5         THE COURT:  All right, sir.  Anything further,

 6   Mr. Rushing?
```

### REDIRECT EXAMINATION

```
 8   BY MR. RUSHING:

 9   Q.  As far as your continuing surveillance of Mr. Sims during

10   that time period from February until September, did you see him

11   meeting with anyone?

12   A.  When he would -- we would see him and some other known drug

13   violators at the 1227 residence via the pole camera, yes, sir.

14   Q.  And what time period was that?

15   A.  It was in that time period between the 3rd to the 13th.

16   Q.  Do you know if it was anytime around September --

17   September 2016 that you saw him at that location with those

18   known drug dealers?

19   A.  I mean, I can't say without looking at video, but...

20         MR. RUSHING:  That's all I have, Your Honor.

21         THE COURT:  All right.  Is this witness finally

22   excused?

23         MR. RUSHING:  Yes, Your Honor.

24         THE COURT:  All right.  You may step down, Mr. Wright.

25   You're excused.  Thank you.
```

1          THE WITNESS:  Thank you, sir.

2          THE COURT:  Who will you call?

3          MR. RUSHING:  Eric Peacock, Your Honor.

4                    **ERIC PEACOCK,**

5    having first been duly sworn, testified as follows:

6                 **DIRECT EXAMINATION**

7    BY MR. RUSHING:

8    Q.  Would you state your name, please, sir, and spell your last

9    name.

10   A.  Eric Peacock, P-E-A-C-O-C-K.

11   Q.  Mr. Peacock, where are you employed, sir?

12   A.  I'm an agent with the Mississippi Bureau of Narcotics,

13   currently assigned to the DEA Task Force in Jackson,

14   Mississippi.

15   Q.  And were you an agent there back in September of 2016?

16   A.  I was.

17   Q.  Were you involved in the investigation of Mr. Sims --

18   A.  I was.

19   Q.  -- during that time period?

20   A.  Yes, sir.

21   Q.  I want to call your attention to September of 2016.  Did

22   you apply and receive a search warrant to search Mr. Sims'

23   residence at 109 Stillhouse Creek Drive in Madison?

24   A.  I did.

25          MR. RUSHING:  May I approach, Your Honor?

1          THE COURT:  You may.

2   BY MR. RUSHING:

3   Q.  I've handed you Exhibit Number 10.  Is that correct?

4   A.  Yes, sir.

5   Q.  And would you look at that and see if that's a true and

6   correct copy of the search warrant that you had issued back on

7   September 2016?

8   A.  It is.

9   Q.  And it's Exhibit Number 11.  Is that correct?

10  A.  10.

11  Q.  10.  Okay.

12          MR. RUSHING:  Your Honor, at this time the government

13  moves Exhibit 10 into evidence for this hearing only, of

14  course.

15          MR. PATE:  No objection, Your Honor.

16          THE COURT:  Exhibit 10 will be received into evidence.

17      (EXHIBIT G-10 MARKED)

18  BY MR. RUSHING:

19  Q.  Mr. Peacock, when you applied for that search warrant for

20  the residence of Mr. Sims, which judge did you appear before?

21  A.  William Chapman in --

22  Q.  And is he --

23  A.  -- Madison County Circuit Court.

24  Q.  I'm sorry?

25  A.  In the Madison County Circuit Court.

1    Q.   He's a circuit court judge?

2    A.   He is.

3    Q.   And I believe you've got -- your affidavit is very similar

4    to the other affidavit -- or the other stash house -- alleged

5    stash house of Mr. Sims.  Is that correct?

6    A.   Yes.  Different -- different counties.

7    Q.   And you have, though -- in your search warrant you have

8    listed about a confidential source?

9    A.   Uh-huh (indicating yes).

10   Q.   The conversation between Mr. Sims and others?

11   A.   Uh-huh (indicating yes).

12   Q.   And that was a wire also.  Is that correct?

13   A.   Yes.

14   Q.   And based upon the information from the wire of the

15   conversation, did you also corroborate in your affidavit what

16   you did to verify the information from the confidential source?

17   A.   Yes.

18   Q.   And is that document in your actual affidavit?

19   A.   It is, yes.

20   Q.   Now, based upon your application, did you receive a search

21   warrant to search that residence?

22   A.   Yes.

23   Q.   And did you search that residence?

24   A.   I did not.

25   Q.   And which residence did you search, sir?

1  A.  I was at the stash house at 1227 Springdale.

2  Q.  Okay, sir.  And you were involved in the search of that

3  residence.

4  A.  I was.

5  Q.  And I believe in the actual warrant it lists certain things

6  to be looking for.  Is that correct?

7  A.  That's correct.

8  Q.  And does it also contain a provision that if you see

9  anything not listed in that affidavit but actually is evidence

10  of a crime or something like that, were you allowed to also

11  seize that?

12  A.  Yes.

13  Q.  Is that set forth in the affidavit?

14  A.  It is.  I could read it if I can refer to it.

15  Q.  Yes, sir.  That's fine.

16      (WITNESS EXAMINED DOCUMENT)

17  A.  Search warrant in paragraph 7, "Do not interpret this writ

18  as limiting your authority to seize all contraband and things

19  the possession of which in itself is unlawful which you find

20  incident to your search or as limiting your authority to make

21  otherwise valid arrests at the place described above."

22  Q.  Now, at the time that you executed that search warrant, did

23  you know whether or not Mr. Sims was a convicted felon or not?

24  A.  We did.

25  Q.  And when you were conducting your search, what were you

1  looking for according to the affidavit itself?

2  A.   Documents in relation to drug trafficking, specifically

3  from methamphetamine and other controlled substances.  Within

4  the affidavit, if I could refer to it, papers, tickets, notes,

5  receipts and other items related to domestic and international

6  travel, books, records, invoices, receipts, records for real

7  estate transactions, bank statements and related records,

8  passbooks, money, drafts, cashier checks, bank checks, safety

9  deposit box keys.

10  Q.   That's good.  Basically, is it safe to say that this

11  warrant is considered to be what most of the other people call

12  a document warrant?

13  A.   Yes, sir.

14  Q.   And in your training and experience, is it common for drug

15  dealers to keep documents concerning their purchases of drugs

16  or either their list of customers in their possession?

17  A.   Yes.

18  Q.   And what type of books were you -- have you seen before

19  that they keep?

20  A.   Ledgers.  Especially large scale drug traffickers, it's not

21  uncommon to front large quantities -- what we call "fronting,"

22  which is given on a credit, and then track payments as they

23  come.  When you have multiple customers, when you're conducting

24  those type of transactions, you've got to keep records of it.

25  Q.   And have you found those in conducting these type of

1  warrants before?

2  A.  I have.

3  Q.  Now, this was an ongoing investigation lasting from I think

4  February at least up until, according to your affidavit, to

5  September.  Is that correct?

6  A.  That's correct.

7  Q.  When you conducted the search of the residence you looked

8  at, where did you actually look for these documents at?

9  A.  Anywhere a document can be maintained.  I mean, you're

10  talking pieces of paper, receipts, things of that nature.  So,

11  I mean...

12  Q.  Would you also look under someone's bed or between their --

13  their bed and their springs I guess to see if there are

14  documents also?

15  A.  Most definitely.

16  Q.  Why is that, sir?

17  A.  It's commonplace for people to store stuff in any location.

18  It's under the bed.  Bills, paperwork anything falls between

19  couch cushions, things like that, I mean, it's -- you know,

20  especially at 1227 it wasn't a...

21  Q.  In your search warrant that you actually conducted the

22  search on, did y'all find any guns in that search?

23  A.  We did.

24  Q.  And where did you find the guns?

25  A.  They were under a loveseat, I guess a couch/loveseat in the

1   front living room under the couch -- or under the cushions of

2   the loveseat.  It was a semiautomatic Ruger pistol and a

3   semiautomatic Glock pistol.

4   Q.  And would you have been looking for documents under that

5   particular area?

6   A.  Yes.

7   Q.  Why?

8   A.  Well, if I recall correctly, there was documents all -- you

9   know, bills and stuff showing proof of residency at that house

10  all throughout that living room in that same general area.  It

11  wasn't well kept or maintained either.  So anything could have

12  slipped or been under there.

13  Q.  And why did you seize and maintain that -- the firearm

14  itself?

15  A.  Going back to the paragraph in the search warrant, I

16  believe that was paragraph 7, it's -- where it states, "Do not

17  interpret this writ as limiting your authority to seize all

18  contraband," et cetera, that is unlawful, we knew Mr. Sims

19  maintained that residence and that he was a convicted felon.

20  So that in and of itself is against the law to have those

21  firearms.

22  Q.  Is that why you seized it?

23  A.  Yes, sir.

24          MR. RUSHING:  Tender the witness, Your Honor.

25          MR. PATE:  May I proceed?

1      THE COURT:  Yes, sir.

2                    **CROSS-EXAMINATION**

3   BY MR. PATE:

4   Q.  Agent Peacock, good afternoon.

5   A.  Good afternoon.

6   Q.  Your involvement in this investigation, did it begin prior

7   to you signing this application in support of the search

8   warrant?

9   A.  Yes.

10  Q.  How long have you been involved in this investigation?

11  A.  I can't recall specifically.  I know the investigation

12  itself that ultimately led to Mr. Sims began September 14.  I

13  can't say exactly when I came to be a part of it specifically.

14  Q.  Okay.  In preparing this affidavit in support of this

15  search warrant, specifically I believe for the Stillhouse Creek

16  Drive residence -- that's the one that you prepared?

17  A.  Yes, sir.

18  Q.  Was there any individual who was working in the

19  investigation, say, DEA agent or otherwise, who instructed you

20  to have this particular responsibility?

21  A.  I'm sure the case agent.  I can't recall specifically

22  somebody saying, *Hey, you do the search warrant.*  You know, I

23  mean, it was all part of -- it's a group effort.

24  Q.  Sure.  But, I mean, you didn't take this upon yourself.

25  Someone directed you specifically to prepare this affidavit for

1    that location.  Or did you just volunteer to do it?

2    A.  I can't recall.  I mean, I don't know if I volunteered or

3    somebody asked me if I could.  I mean, I just -- it was part of

4    the investigative effort.  Everybody -- it was a team effort.

5    Q.  Sure.

6    A.  I can't say specifically that one particular person told

7    me, *Hey, will you do this warrant?* or me coming  -- approaching

8    somebody saying, *Hey, I'll do this.*  I -- that's -- I can't --

9    like I said, I can't testify to that.

10   Q.  Don't know.  And it's fair to say this was a joint

11   investigation, federal and state as well.  Correct?

12   A.  Correct.

13   Q.  Are you familiar with any search warrants in connection

14   with this case for houses, residences that were presented to a

15   federal judge?

16   A.  Off the top of my head, I don't.  I believe the wire

17   affidavit.  I mean --

18   Q.  Right.

19   A.  -- they weren't search warrants, but I believe the

20   affidavits were federal, but I can't recall specifically if

21   they were -- I mean, obviously, it was an over-two-year

22   investigation.  So I don't know if it was federal search

23   warrants and state search warrants throughout the whole case.

24   I can't say specifically.

25   Q.  You had testified that the affidavit that you prepared was,

1    I believe that the testimony was, a very similar affidavit to

2    the one prepared in connection to the other residence

3    associated with Mr. Sims.  Is that correct?

4    A.   That's correct.  It was -- I mean, essentially, the two

5    houses that were -- that affidavits were applied for were --

6    one was in Madison County.  One was in Hinds County,

7    Mississippi.  But, essentially, we were looking for the same

8    things, and they were both maintained and controlled by

9    Mr. Sims.

10   Q.   Did you actually draft this affidavit, Exhibit 10?

11   A.   Draft it in terms like prepare it?

12   Q.   Wrote it, yes, sir.

13   A.   Yes, sir.

14   Q.   You wrote it.

15   A.   Yes.

16   Q.   Okay.  Did you also write the affidavit that's in Exhibit

17   11?  And I don't know if you referred to that.  That's the one

18   for the other residence associated with Mr. Sims.

19   A.   1227 --

20   Q.   Yes, sir.

21   A.   -- Springdale?  I did not write that one.

22   Q.   All right.

23        MR. PATE:  Your Honor, may I approach and retrieve

24   that exhibit?

25        THE COURT:  Yes, sir.

 1    BY MR. PATE:

 2    Q.  Agent Peacock, I'm going to hand you a document that's been

 3    marked and admitted as Government's Exhibit Number 11.  Does

 4    that look familiar to you?

 5    A.  It looks like the affidavit and underlying facts and search

 6    warrant for 1227 Springdale Drive, Jackson, Mississippi, that

 7    was prepared by MBN Agent Richard Wright.

 8    Q.  Okay.  Can I ask you to turn to page 12 of that document,

 9    Exhibit Number 11, specifically to paragraph J.

10    A.  Okay.

11    Q.  And just read that to yourself and compare it, if you will,

12    to your paragraph I in Exhibit Number 10 and see if you can

13    identify any differences.

14        (WITNESS EXAMINED DOCUMENT)

15    A.  You said paragraph I?

16    Q.  Yes, sir.

17        (WITNESS EXAMINED DOCUMENT)

18    A.  They are similar.

19    Q.  They're exactly the same, are they not?

20    A.  In I in Exhibit 10, which is the search warrant that I

21    applied for being able to maintain surveillance on Sims' stash

22    house located at 1227 and at Sims' residence located at 109,

23    and then I -- or J.  I'm sorry.

24        (WITNESS EXAMINED DOCUMENT)

25    A.  Yeah.  They are.

1    Q.   Okay.  Did you also draft the other affidavit, Exhibit 11?

2    A.   I -- I mean, I might have provided -- we provided

3    assistance to each other.  Like I said, it was a group effort.

4    Q.   Sure.

5    A.   It's a task force and we, you know, work on them together.

6    Q.   Sure.  And I'm not suggesting anything's inappropriate with

7    that.  I mean, a lot of the language is similar.  You're

8    detailing a lot of the same investigation.  Fair to say?

9    A.   Correct, and two residences controlled by the same

10   individual.

11   Q.   That's right.  So let me focus then on the one that you

12   prepared, which was Exhibit 10.  And, again, that paragraph I

13   is what I'm specifically referring to.  And you've just

14   refreshed your recollection with that, did you not?  You just

15   looked at it.

16   A.   Correct.

17   Q.   Okay.  And the paragraph states, Since February 3rd, 2016,

18   agents have been able to maintain surveillance on Sim's stash

19   house at the 1227 Springdale address and at Sims' residence

20   located at the 109 Stillhouse Creek address and have

21   observed -- where agents have observed Sims to be still

22   residing and utilizing, and then the silver Lexus is

23   identified, as recent as September 13th, 2016.  Is that a fair

24   summary of that paragraph?

25   A.   Yes, sir.

1   Q.   Okay.   So on September 13, 2016, was Mr. Sims at the 1227

2   Springdale Drive address or at the 109 Stillhouse Creek

3   address?

4   A.   I can't recall specifically to that.   He utilized both of

5   them on a regular basis.

6   Q.   Well --

7   A.   Based on our surveillance, it was a continuity of him on a

8   daily to weekly basis that we were maintaining that

9   surveillance on him he would go to 1227; he would go to 109.

10  It -- I mean, he utilized them both through -- I can't

11  specifically say September 13th he was here, September 13th he

12  was there.   I can't, aside from what is in here.

13  Q.   Right.   And let's focus on that.   What was your intent --

14       THE COURT:   Wait.   My patience and endurance are both

15  running a little bit thin, and I don't really know that this

16  comparison is of importance to your overall argument.   So --

17       MR. PATE:   Yes, sir.   I will move on.   Thank you for

18  that.

19  BY MR. PATE:

20  Q.   Between the date of February 3rd, 2016, and September 13th,

21  2016, were you personally involved in any investigation that

22  related specifically to Mr. Sims?

23  A.   I'm sorry.   Could you say those dates again?

24  Q.   Sure.   February 3rd, 2016, which is referenced in your

25  affidavit, there was a particular transaction you guys were

1  monitoring --

2  A.  Yeah.

3  Q.  -- at the time.  Then you say he was still at one of those

4  houses or both on September 13th, 2016.  What did you observe

5  as part of your investigation Mr. Sims doing during that

6  seven-month period of time?

7  A.  To still be utilizing both -- the frequency of the people.

8  I can say on 1227, customers and things of that nature that had

9  been identified in the investigation that were still coming to

10 that one.  Obviously, he didn't utilize 109 for distributing

11 his narcotics out of that I could recall because that was where

12 his family was.

13    But it wasn't just myself that was conducting the

14 surveillance.  Like I said, it was a group effort.  There was

15 probably 15, 20 plus agents specifically involved on this case.

16 I can't say every day it was me going by these residences or

17 seeing what was going on.  There was several agents.

18 Q.  Well, in preparing this affidavit, what did you communicate

19 to the state court judge that Mr. Sims had been doing between

20 February 3rd and September 13th?

21 A.  I can read you the affidavit.  I mean, I can't -- this was

22 written so long ago.  I'd have to read it specifically to tell

23 you.  I can't just recall right off the top of my head.  It's

24 been so long ago.

25 Q.  But everything that you would have described to the

1  magistrate would have been in this affidavit.

2  A.  Correct.

3  Q.  You didn't tell him something that's outside of the

4  affidavit.

5  A.  No, sir.

6  Q.  Okay.

7      MR. PATE:  That's all I have, Your Honor.

8      THE COURT:  All right.  Any redirect?

9      MR. RUSHING:  No, Your Honor.

10     THE COURT:  All right.  You may step down.

11     MR. RUSHING:  My last witness, Your Honor, is Joe

12 Walker.  He shouldn't be very long.  Joe Walker.

13                        **JOE WALKER,**

14 having first been duly sworn, testified as follows:

15                   **DIRECT EXAMINATION**

16 BY MR. RUSHING:

17 Q.  Would you state your name for the record, please, sir.

18 A.  Joe Walker.

19 Q.  And, Mr. Walker, where are you employed, sir?

20 A.  I'm a special agent with the Drug Enforcement

21 Administration.

22 Q.  Were you working in that capacity back in September of

23 2016?

24 A.  Yes.

25 Q.  And were you involved in a search of the residence of 109

1    Stillhouse Creek Drive in Madison?

2    A.  I was.

3    Q.  And did you participate in the search of that residence?

4    A.  I did.

5    Q.  And, now, the search warrant that you had, you didn't

6    actually execute that warrant, did you?

7    A.  I did not.

8    Q.  Or the affidavit, rather.

9    A.  Right.  I did not.

10   Q.  But you were an agent in the search?

11   A.  Yes.

12   Q.  And is it fair to say that the search you're looking for

13   were actually documents concerning illegal drug trafficking?

14   A.  That's correct.

15   Q.  What's commonly referred to as a document warrant?

16   A.  Yes.

17   Q.  During your execution of that warrant, what type of place

18   were you looking for documents?

19   A.  I was looking for documents anywhere that a piece of paper

20   or any type of electronic equipment or a record of any type

21   could be hid, stored or located.

22   Q.  In conducting your search did you come across other things

23   not listed specifically in the document for the affidavit -- I

24   mean for the search warrant, rather, specifically guns?  Did

25   you ever find any of those?

1    A.  Yes, I did.

2    Q.  And where did you find the gun?

3    A.  Master bedroom nightstand.

4    Q.  And what part of the nightstand was it?

5    A.  It was in the drawer.

6    Q.  And is that a place where you actually found documents

7    also?

8    A.  It is.

9    Q.  Did you find other contraband that wasn't listed in the

10   document warrant that day?

11   A.  Yes.

12   Q.  And what was that, sir?

13   A.  We found tax records.  We found U.S. currency.  Found

14   another gun that was inside of a vehicle parked at the

15   residence also, and just assortment of documents.

16           MR. RUSHING:  Tender the witness, Your Honor.

17                        **CROSS-EXAMINATION**

18   BY MR. PATE:

19   Q.  Agent Walker, good afternoon.

20   A.  Good afternoon.

21   Q.  You were involved in executing the search warrant on which

22   residence, again?

23   A.  At 109.

24   Q.  And in reviewing that search warrant that authorized the

25   search of that particular residence, did you think that there

1   was anything in that warrant that limited your ability to look

2   in some part of that house?  In other words, was there

3   somewhere you thought *I can't go there*?

4   A.  No.

5   Q.  So when you entered the house, in your mind, you're

6   thinking, *Wherever a piece of paper may be found that I can*

7   *relate to this investigation, I can go search that place.*

8   A.  Yes.

9   Q.  Fair to say?  And at the end of the day did you believe

10   that your reading of that warrant left it to your determination

11   or another agent's determination as to what particular items

12   could be seized during the time the warrant was being executed?

13   A.  Yes.

14   Q.  Did agents seize a car from one of those residences?

15   A.  They did.

16   Q.  Which residence was that?

17   A.  We seized a Lexus from the residence I was at, 109.

18   Q.  Was there anything specifically in that search warrant that

19   you believe gave you the authority to seize the vehicle?

20   A.  Not necessarily the vehicle.  We have different types of

21   seizure authority, whether that be admin or if we do a seizure

22   warrant.  I was not aware if there was a seizure warrant for

23   that vehicle or if they just did it administratively.

24         MR. PATE:  That's all I have, Your Honor.

25         THE COURT:  All right, sir.  Redirect.

```
 1              MR. RUSHING:  No more questions of this witness, Your

 2    Honor.

 3              THE COURT:  All right, sir.

 4              MR. RUSHING:  Your Honor, the government does offer

 5    Exhibit Number 9 that was talked about by one of the witnesses.

 6    That is a compact disc of the call to Herrin-Gear that was

 7    discussed in this hearing, Your Honor.  We'd offer that into

 8    evidence.

 9              MR. PATE:  No objection to that.

10              THE COURT:  Exhibit 9 will be received into evidence.

11         (EXHIBIT G-9 MARKED)

12              MR. RUSHING:  Yes, sir.  Your Honor, I also have

13    Exhibit Number 12, and that is a print-off of my time sheet

14    showing that I was out of the office on September the --

15    September 7th, September 8th and September 9th, Your Honor.  I

16    would offer that as an exhibit also, Your Honor.

17              MR. PATE:  We have no objection to that, Your Honor.

18              THE COURT:  All right.  Exhibit 12 will be received

19    into evidence.

20              MR. RUSHING:  It's December I'm sorry, not September.

21    December.

22         (EXHIBIT G-12 MARKED)

23              MR. RUSHING:  That's all we have, Your Honor.

24              THE COURT:  All right.  Anything from the defendant --

25              MR. PATE:  No evidence, Your Honor.  Thank you.
```

1    THE COURT:  -- in the way of evidence?  What I'm going

2   to do is ask each side to prepare a proposed order in effect

3   stating how you would want me to rule and the reasons and so

4   forth.  I don't see any need for long ones.  If I were to write

5   my own now, I would probably be able to do it in eight to ten

6   pages or something like that.

7        I do not have my mind made up, and that's why I want

8   to hear both of yours.  I don't see any reason in listening to

9   the arguments that you've already made to me in your memoranda

10  that you have filed.

11       Do I need to have two orders, one for each motion, or

12  can they be combined?  You'd rather write them separately?

13  It's fine with me.

14       MR. RUSHING:  I'd prefer separately, Your Honor.

15       MR. PATE:  I agree, for the record.

16       THE COURT:  All right.  Can you do it in ten pages for

17  each one?

18       MR. RUSHING:  I think so, Your Honor.

19       MR. PATE:  I can, Your Honor.  And I'll take the

20  liberty of focusing on the arguments that I hope are most

21  persuasive to the court, but I may miss it.  You may be seeing

22  something I'm not.

23       THE COURT:  And I will reserve the right to amend

24  either one and I very well may, whichever route I decide to go.

25  But I am going to be out of my office for the next -- for the

1    rest of this week and until Tuesday of next week.  Let me ask

2    you to get your submissions to me by next Tuesday, whatever

3    that is.

4              THE COURTROOM DEPUTY:  The 14th.

5              THE COURT:  The 14th.  And then I will take those and

6    have a chance to get back with my notes and with the other

7    papers in the matter and get a ruling on it relatively soon.

8    Is this case set for trial at this time?

9              MR. RUSHING:  Your Honor, there's a motion to continue

10   the case that's been filed by Mr. Pate, and I have no objection

11   to that.  I think Mr. -- I think there's two defendants have

12   filed motions to continue, Mr. Pate and Mr. Hollomon also, Joe

13   Pacheco, the codefendant in this case.

14             THE COURT:  Mr. Rushing has a retirement date coming

15   up.  Are you trying to get this tried before you retire?

16             MR. RUSHING:  Not really, Judge.  I would like to keep

17   people -- from putting it on someone else, but I do have other

18   co-counsel that can assist.

19             THE COURT:  All right.  With that information,

20   we'll -- I will get together with both sides perhaps by

21   telephone call or something and find a date for a trial, and it

22   will be after the first of the year anyway.  So we'll get this

23   out of the way and work on a trial date.

24             MR. PATE:  Thank you, Your Honor.

25             MR. RUSHING:  Thank you, Your Honor.

1              THE COURT:  Is there anything else we need to discuss

2     here today about the case, about trial?

3              MR. RUSHING:  I don't think so, Your Honor.

4              MR. PATE:  I don't believe so.  No, sir.

5              THE COURT:  All right.  All right.  Well, thank you

6     very much.

7              MR. RUSHING:  Thank you, your Honor.

8         (OFF RECORD DISCUSSION)

9              THE COURT:  If there's nothing further then, we are in

10    recess.

11        (HEARING CONCLUDED)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATE OF REPORTER

2

3         I, MARY VIRGINIA "Gina" MORRIS, Official Court

4  Reporter, United States District Court, Southern District of

5  Mississippi, do hereby certify that the above and foregoing

6  pages contain a full, true and correct transcript of the

7  proceedings had in the aforenamed case at the time and

8  place indicated, which proceedings were recorded by me to

9  the best of my skill and ability.

10         I certify that the transcript fees and format

11  comply with those prescribed by the Court and Judicial

12  Conference of the United States.

13         This the 9th day of October, 2018.

14

15                        s/ Gina Morris
                           U.S. DISTRICT COURT REPORTER

16

17

18

19

20

21

22

23

24

25